125 P.3d 484

**In the Matter of the Application of WAIK-OLOA SANITARY SEWER COMPANY, INC., dba West Hawai'i Sewer Company, for Approval of Rate Increases and Revised Rate Schedules.**

No. 25087.

Supreme Court of Hawai'i.

Dec. 29, 2005.

As Corrected Feb. 2, 2006.

Alan M. Oshima and Lawrence M. Reifurth (Oshima Chun Fong & Chung), Honolulu, on the briefs, for applicant-appellant.

Michael Azama, on the briefs, for appellee State of Hawai'i Public Utilities Commission.

Laureen K.K. Wong, Honolulu, and John E. Cole, on the briefs, for appellee Division of Consumer Advocacy, Department of Commerce and Consumer Affairs.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold, in this appeal by Applicant–Appellant Waikoloa Sanitary Sewer Company, Inc., dba West Hawaii Sewer Company (Appellant) that (1) because the filed-rate doctrine applies to the Contributions in aid of construction (CIAC) payments provision of the tariff filed by Appellant with Appellee Public Utilities Commission of the State of Hawai'i (Commission), "contributions" collected by Appellant were nonrefundable under the terms of the tariff; (2) the use of CIAC funds by Appellant did not violate the terms of the tariff on file with the Commission; (3) the plain language of the tariff presents no conflict as to Appellant's use of Net Operating Losses (NOL) funds to offset its tax liabilities; and (4) Appellant failed to timely raise the issue of miscalculation of its Test Year income taxes before the Commission. Therefore, (1) Decision and Order No. 19223 (decision and order) issued by the Commission on February 27, 2002, directing Appellant to refund contributions and (2) Order No. 19294 (order) issued by the Commis-

sion on April 10, 2002 denying Appellant's motion for reconsideration of the decision and order are reversed and Appellant's appeal of the miscalculation issue is dismissed.

### I.

Appellant appeals from the decision and order and the order. The decision and order approved Appellant's request for a general rate increase and directed Appellant to refund $681,400 to the "contributors"[1] to Appellant's CIAC funds from 1987 to 1996. In the proceeding before the Commission, Appellee Division of Consumer Advocacy, Department of Commerce and Consumer Affairs of the State of Hawai'i (the Consumer Advocate) disputed Appellant's position on the treatment of CIAC funds for income tax purposes and the application of the tax gross-up method.[2]

### II.

Appellant is a public utility that provides wastewater collection and treatment service to residences, condominiums, commercial establishments, and public facilities located at Waikoloa Village on the island of Hawai'i. The facts concerning CIAC funds are as follows.

Prior to 1987, section 118(b) of the Internal Revenue Code (IRC) provided that CIAC funds received by public utilities were not included in the taxable income of such public utilities, and therefore, were not subject to taxation. IRC § 118(b) (1986).

Effective December 22, 1984, Appellant's "Rules and Regulations, Description of Service Area and Sewer Rate Schedules" were published as tariff rules with the Commission. These rules did not include any references or instructions as to CIAC funds.

On January 1, 1987, the Tax Reform Act of 1986 (Tax Reform Act) took effect and repealed IRC § 118(b). As a result, CIAC funds were subjected to income taxes and

treated as taxable income in the year received.

On May 1, 1990, Appellant filed a "Notice of Revisions to its Rules and Regulations" (notice) with the Commission. This notice proposed Rule XI as "[a] new rule requiring [CIAC] from developer and commercial applicants for service ... to help [Appellant] pay for the cost of expanding the capacity of its water system to serve such applicants." The notice described Rule XI as follows:

Proposed Rule XI is particularly important to the continued viability of [Appellant]. *This Rule calls for developers, builders and commercial applicants to pay a [CIAC] to cover the cost of capacity expansions necessary to provide service to new or substantially expanded developments, subdivisions, and commercial facilities.* It is common industry practice for water and sewer utilities to require developers and commercial applicants to contribute the cost of adding water and sewer system facilities. This enables the utilities to raise and/or repay the funds necessary to develop the new facilities, while ensuring that existing customers will not be burdened with the costs of adding facilities to serve new customers. The amount of the proposed contribution was established based on a study conducted by [Appellant's] staff, with assistance from R.M. Towill Corporation. In general, *the proposed contribution represents the anticipated cost of constructing new facilities to serve future customers, including the income taxes payable on contributions.*

(Emphases added.)

The study proposing the amount of CIAC was attached to Appellant's notice as Exhibit E. Entitled "[Appellant's] Sewage Treatment Facility Development Program and Calculation of CIAC Fee," Exhibit E first explained that, "[a]s yet, [Appellant] has not established a [CIAC] program ... in order to provide the required capital for additional

---

1. In its decision and order, the Commission directs Appellant to refund CIAC funds to "contributors." It appears that these contributors are nine real estate developers.

2. According to the Commission's Order No. 19335, *see* discussion *infra*, "[u]nder the full gross-up method, the contributors of CIAC ... would be required to pay a sum, over and above the CIAC ..., sufficient to cover the taxes associated with the contributions[.]"

sewage treatment facilities needed to meet expected future demand. This report summarizes efforts to establish an appropriate CIAC for [Appellant]." Exhibit E then stated that "[a] CIAC fee is a *non-refundable fee* charged to developers for the cost of expanding capacity in the utility company to service new demand." (Emphasis added.) Exhibit E listed four components to the CIAC fee, including "Sewage Treatment Plant Capacity, Primary Collection, *Income Taxes,* and Financing," and *"attributed $2.25 [per] gallon to the [i]ncome [t]ax [c]omponent."* (Emphases added.) Lastly, Exhibit E "concluded that a fee of $9.50 [per] gallon was 'the fee which minimized financing charges over time and did not build cash reserves in [Appellant].' "

## III.

On July 5, 1990, Appellant's proposed Rule XI labeled as "WSSC Tariff No. 1" became effective as a tariff.[3] Section 1 of Rule XI provided that "[a]s a condition of receiving service or substantially increasing sewage outflow volume from new or substantially modified facilities, *developer and commercial applicants shall be required to pay a non-refundable [CIAC] to [Appellant]."* (Emphasis added.) Section 2 of Rule XI generally described the uses of CIAC payments. It states in relevant part:

> 2. [CIAC] payments are used by the Company to install or *pay for new or expanded sewage treatment plant facilities* required to serve such applicants or consumers, *including:*
>
> (a) Construction of new primary collection main extensions;
>
> (b) Construction of new percolation ponds and injection wells;
>
> (c) Construction of new primary collection system or improvements to increase

the capacity or efficiency of the existing primary collection system;

> (d) Preparation, engineering and design work necessary to the construction of new sewer treatment facilities; and
>
> (e) Related improvements intended to increase the capacity, efficiency or quality of the primary sewer system (see Exhibit C, Description of the System).

(Emphases added.) Section 6 of Rule XI specified that *"[t]he amount of the [CIAC] shall be $9.50* per gallon of estimated daily sewage discharge [ (EDSD) ] from the premises." (Emphasis added.)

## IV.

On April 13, 1992, the Commission initiated Docket No. 7287, "Instituting a Proceeding to Examine the Gross–Up of [CIAC] and Customer Advances to Include Federal Income Taxes." The Commission opened this docket, "on its own motion, to examine ... whether a public utility should be required to gross-up CIAC ... to include federal income tax requirements." On February 11, 1993, the Commission conducted an evidentiary hearing in Docket No. 7287 and "admitted all filed submissions into evidence."

## V.

In 1996, the Small Business Job Protection Act amended IRC § 118. Under this Act, "CIAC funds received by an affected utility after June 12, 1996, were no longer subject to income taxation."[4] Between January 1, 1987 and June 12, 1996 (time period), Appellant collected approximately $1,930,444 in CIAC funds from the developers. An estimated $732,990 of these funds represented the portion for income taxes payable. During this time period, Appellant reported negative taxable income in all but two years and remitted a lesser amount, approximately $51,590, to

---

3. The parties do not dispute that Rule XI became effective on July 5, 1990.

4. As related to the change in tax laws with the passage of the Small Business Job Protection Act of 1996, the Commission noted the following in footnote 11 of Order No. 19335:

> With regards to this tax change, *the [C]ommission issued a letter, dated August 21, 1997, to all*

> *regulated water and sewer utilities advising them to: (1) revise their tariff sheets to remove the income tax provision relating to their CIAC ...;* and (2) refund or credit the respective contributors of CIAC ... if any income taxes for them were received after the June 12, 1996, effective date.

(Emphasis added.)

the taxing authorities for CIAC payments received. Due to its reported NOL, which fully offset any taxable income in the given year, Appellant was not required to pay any income taxes for the other years.

In accord with the Small Business Job Protection Act, Appellant filed a revised Rule XI with the Commission. The revised Rule XI retained the language of Sections 1 and 2, but amended the language of Section 6 to provide that "[t]he amount of the [CIAC] shall be $7.25 per gallon of [EDSD] from the premises." After June 12, 1996, no income taxes were collected as part of CIAC funds. The revised Rule XI became effective on August 12, 1996.

## VI.

On January 19, 2001, Appellant filed an application with the Commission, pursuant to Hawai'i Revised Statutes (HRS) § 269–16(b) (Supp.2004),[5] requesting approval for, *inter alia*, a wastewater treatment rate increase and rate schedule revision based on the 2001 calendar test year. On January 30, 2001, Appellant filed an amended application. The Consumer Advocate filed its initial statement with the Commission on February 9, 2001, and did not object to the completeness of Appellant's application as amended.

By letter dated September 21, 2001, and signed jointly, Appellant and the Consumer Advocate agreed to (1) waive the evidentiary hearing before the Commission; (2) file a partial stipulation in lieu of the hearing, on the issues they had resolved; (3) file simultaneous briefs addressing any remaining issues in dispute; and (4) an award of interim rates to Appellant. On September 28, 2001, the Commission approved these agreements and permitted the filing of a stipulation and simultaneous briefs.

On October 15, 2001, Appellant and the Consumer Advocate filed a partial stipulation which incorporated their agreement on certain issues. On October 19, 2001, Appellant and the Consumer Advocate filed a joint supplemental stipulation in lieu of a hearing. According to the Consumer Advocate's answering brief on appeal, this joint supplemental stipulation (1) "discussed the treatment of ... [CIAC] funds for income tax purposes, and the application of the tax gross-up method to CIAC," and (2) *"deferred resolution of the CIAC gross-up issue to ... Docket No. 7287."* (Emphasis added.)

On November 5, 2001, the Commission issued its interim decision and order No. 18995. This interim order approved an in-

---

5. HRS § 269–16(b) states in relevant part:

 No rate, fare, charge, classification, schedule, rule, or practice, other than one established pursuant to an automatic rate adjustment clause previously approved by the commission, shall be established, abandoned, modified, or departed from by any public utility, except after thirty days' notice as prescribed in section 269–12(b) to the commission and prior approval by the commission for any increases in rates, fares, or charges. The commission may, in its discretion and for good cause shown, allow any rate, fare, charge, classification, schedule, rule, or practice to be established, abandoned, modified, or departed from upon notice less than that provided for in section 269–12(b). A contested case hearing shall be held in connection with any increase in rates and such hearing shall be preceded by a public hearing as prescribed in section 269–12(c) at which the consumers or patrons of the public utility may present testimony to the commission concerning the increase. The commission, upon notice to the public utility, may suspend the operation of all or any part of the proposed rate, fare, charge, classification, schedule, rule, or practice or any proposed abandonment or modification thereof or departure therefrom and after a hearing by order regulate, fix, and change all such rates, fares, charges, classifications, schedules, rules, and practices, so that the same shall be just and reasonable and prohibit rebates and unreasonable discrimination between localities, or between users or consumers, under substantially similar conditions, regulate the manner in which the property of every public utility is operated with reference to the safety and accommodation of the public, prescribe its form and method of keeping accounts, books, and records, and its accounting system, regulate the return upon its public utility property, the incurring of indebtedness relating to its public utility business, and its financial transactions and do all things in addition which are necessary and in the exercise of such power and jurisdiction, all of which as so ordered, regulated, fixed, and changed shall be just and reasonable, and such as shall provide a fair return on the property of the utility actually used or useful for public utility purposes.

crease in revenues of $103,944 or 17.3%, over revenues at then existing rates.

On November 14, 2001, the Commission issued order No. 19015 "direct[ing] the parties to file simultaneous position statements on the CIAC tax gross-up issue in this docket and *rejected the parties' supplemental agreement to defer consideration of the tax gross-up issue to Docket No. 7287."* (Emphasis added.) On December 17, 2001, the parties filed their respective position statements on the CIAC tax gross-up issue.

On February 27, 2002, the Commission issued its decision and order (1) ruling that Appellant "could increase its rate to produce additional Revenues of $139,965, based on an estimated Total Revenue Requirement of $740,383" and (2) "direct[ing Appellant] to refund the Remaining Balance to the Developers." The decision and order stated in pertinent part as follows:

From 1987 to June 11, 1996, CIAC funds received by [Appellant] were considered taxable income in the year received. During 1987—1996, *[Appellant] collected approximately $1,930,444 in CIAC, of which an estimated $732,990 represented the portion for income taxes payable.*[6] However, since [Appellant] recorded negative taxable income in all but two years, *[Appellant] remitted a lesser, five-figure amount to the taxing authorities for CIAC. [Appellant] retains the remaining six-figure balance of $681,400, which was never remitted by [Appellant] to any taxing authority. Instead, this amount is reflected as a tax liability in [Appellant's] financial statements.*

*[Appellant] recorded the collection of CIAC in two separate accounts:* (1) CIAC, net of income tax, was recorded in the CIAC account; and (2) the income tax portion was recorded as a credit to the [i]ncome [t]ax [p]ayable account.

. . . .

Upon careful review, the *[C]ommission finds* that, under the facts of this case, *the remaining balance of $681,400 is not CIAC. Rather, this balance represents the amount collected by [Appellant], from 1987 to 1996, for the payment of income taxes for the various projects under which CIAC was assessed.*

*During 1990 to 1996, the tariff rate of $9.50 per gallon of [EDSD] included the gross-up amount of $2.25 per gallon EDSD for income tax payments.* This portion of the amount collected was not used for the construction of new or expanded plant facilities. Rather, [Appellant] retained this portion to pay the income taxes due on the various projects [ ] which CIAC was assessed. *Prior to 1990, meanwhile [Appellant's] tariff did not include Rule XI.*

The *[C]ommission finds that [Appellant's] retention of the $681,400 is inconsistent with the underlying purpose of the full gross-up method.* The full gross-up method was not intended to allow a utility to collect and retain cash reserves for purposes other than the payment of income taxes for the tax year payable. As amply noted by the California Public Utilities Commission, in the event the utility did not have taxable income, there is no tax liability, and the utility should refund the tax to the contributor.

*Based on the foregoing reasons, the [C]ommission will direct [Appellant] to refund to the contributors the remaining balance of $681,400.* Within 10 days from the date of this decision and order, [Appellant] shall submit to the [C]ommission for review and approval, a refund plan. In this respect, [Appellant] appears to identify 17 affected projects. Lastly, the refund of the $681,400, in and of itself, will have no impact on [Appellant's] revenue requirement. As a result, no adjustment by the [C]omission to the attached schedules is necessary.

(Emphases added.) (Footnotes omitted.)

On March 11, 2002, Appellant filed a motion for reconsideration of the Commission's decision and order. On April 10, 2002, the

---

**6.** Although Rule XI became effective on July 5, 1990, none of the parties raise any arguments about the specific refundability of amounts allocated as income tax for CIAC collected from 1988 to the effective date of the tariff.

Commission issued its order denying Appellant's motion for reconsideration.

## VII.

On May 3, 2002, the Commission issued Order No. 19335 [7] in Docket No. 7287, terminating its investigation and closing that docket. By this order, the Commission concluded that the matters concerning the treatment of the receipt of CIAC were "moot" inasmuch as (1) "water and sewer utilities [were] no longer required to include the receipt of CIAC ... as taxable income" because of the passage of the Small Business Job Protection Act of 1996 and (2) "since the inception of this docket, the Commission directly or indirectly found in various concluded rate proceedings that the respective treatment of the receipt of CIAC ... is reasonable, as applicable, for ratemaking purposes."

## VIII.

On May 10, 2002, Appellant filed its notice of appeal with this court. On appeal, Appellant argues that the Commission erred by (1) "requiring that [Appellant] refund the Remaining Balance of the Income Taxes Payable (ITP) Account to the Developers" (the refund issue) and (2) "[mis]calculating [Appellant's] Test Year taxes" (the miscalculation issue). With regard to the refund issue, Appellant contends that the Commission erred (a) in concluding that "the remaining balance of $681,400 is not CIAC"; (b) in deciding that Appellant "collected approximately $1,930,444 in CIAC, of which an estimated $732,990 represented [a severable] ... portion for income taxes payable"; (c) "in refusing to recognize the [NOL] offset to pay the developer-caused tax liability"; (d) in determining there is a windfall for [Appellant] because "there is no 'Remaining Balance' "; (e) in directing a refund because "[r]efund of the 'Remaining Balance' is pro-

hibited by State law"; and that (f) "[i]f a refund is appropriate at all, it is something quite different from what the Commission calculates."

With regard to the miscalculation issue, Appellant maintains that the Commission miscalculated Appellant's Test Year income taxes leading to an underestimation of its Total Revenue Requirement and resulting in lower net income after taxes.

The Commission contends that (1) the decision and order is correct because the Commission's findings that (a) Appellant collected approximately $1,930,444 in CIAC funds, of which an estimated $732,990 represented the portion for income taxes payable and (b) the remaining balance of $681,400 was not CIAC funds are supported by "reliable, probative and substantial evidence" in the record; (2) Appellant's "NOL argument is irrelevant to the CIAC tax gross-up issue"; and (3) "any alleged calculation error [was] not properly preserved on appeal."

The Consumer Advocate essentially reiterates the three arguments advanced by the Commission and also maintains that (1) "Appellant's treatment of CIAC tax gross-up results in a windfall for [Appellant]"; (2) the Commission's "decision does not result in a retroactive adjustment to CIAC"; (3) "the filed rate doctrine is not applicable" because (a) "the funds collected to pay income taxes due on the various projects on which CIAC was assessed are not CIAC," (b) "the public policy concerns behind the filed rate doctrine are not present here," and (c) "if the filed rate doctrine applies, Appellant has violated its own tariff"; (4) "Appellant's CIAC tariff rate included an amount for income taxes payable"; and (5) "Appellant's argument that receipt of CIAC increases a utility's potential tax liability in all cases is untimely as well as irrelevant."

7. Order No. 19335 is attached to Appellant's opening brief as Appendix 10. In its opening brief, Appellant requests that this court "take judicial notice pursuant to Rule 201, Hawai'i Rules of Evidence, of the fact that Docket No. 7287 was closed (1) on May 3, 2002, (2) without providing any generic direction to utilities under that docket relating to the regulatory ramifications of income tax treatment of CIAC caused by

the [Tax Reform Act]." The Commission and the Consumer Advocate do not oppose this request in their answering briefs or challenge Order No. 19335. Both the Commission and the Consumer Advocate also acknowledge in their answering briefs that Docket No. 7287, in October 2001, was a "pending investigation of the CIAC income tax issue."

The Commission and the Consumer Advocate request that this court affirm *in toto* the Commission's decision and order no. 19223, and order no. 19294. Appellant "requests that the [d]ecision & [o]rder be vacated to the extent of the Commission's direction concerning the ... [r]efund issue, and that the case be remanded to the Commission with instructions to issue an order consistent with the Court's opinion as it relates to the recalculation of the [Appellant's] Test Year Income Taxes, TRR and Additional Revenues."

## IX.

### A.

An appeal from a final order of the Commission is taken to this court pursuant to HRS § 269–15.5 (Supp.1998).[8] All three parties refer to HRS § 91–14(g) (1993) as the applicable standard of review.[9] Pursuant to HRS § 91–14(b), in a direct appeal to the supreme court "the appeal shall be in like manner as an appeal from the circuit court to the supreme court." HRS § 91–14(g) provides in relevant part that "[u]pon review of the record [we may] ... reverse ... the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are ... [a]ffected by ... error of law[.]"

■ Under HRS § 91–14(g), "a reviewing court will reverse an agency's findings of fact if it concludes that such a finding is clearly erroneous.... On the other hand, the agency's conclusions of law are freely reviewable." *Sussel v. Civil Serv. Comm'n of the City &*

*County of Honolulu,* 74 Haw. 599, 609–610, 851 P.2d 311, 317 (1993) (citations omitted).

### B.

We note that the Commission and the Consumer Advocate argue that a "presumption of validity" is to be accorded to the Commission's decisions and that Appellant has a "heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences" under *In re Gray Line Hawaii, Ltd.,* 93 Hawai'i 45, 53, 995 P.2d 776, 784 (2000). The Commission also posits that its "interpretation of its own administrative rules, unless contrary to public policy, is given deference by the court" pursuant to *In re Wind Power Pac. Investors–III,* 67 Haw. 342, 344, 686 P.2d 831, 833 (1984).

■ Because we are presented with the issue of whether the CIAC in this case fall within the purview of a tariff, the filed-rate doctrine is implicated. Inasmuch as the filed-rate doctrine originates in federal case law, *see Balthazar v. Verizon Hawaii, Inc.,* 109 Hawai'i 69, 123 P.3d 194, 199 (Nov.2005), the standard of review for tariffs employed in the federal courts is persuasive.

■ In *Great Northern Ry. Co. v. Merchants' Elevator Co.,* 259 U.S. 285, 288, 42 S.Ct. 477, 66 L.Ed. 943 (1922), the United States Supreme Court was presented with a similar issue in which the defendant railway elevator company sought a refund from the plaintiff carrier that was alleged to have been collected in violation of the carrier's filed

---

8. HRS § 269–15.5 provides in relevant part that "[a]n appeal from an order of the public utilities commission under this chapter shall lie to the supreme court, subject to chapter 602, in the manner and within the time provided by chapter 602 and the rules of court." HRS chapter 602 governs the courts of appeal in this jurisdiction, with HRS § 602–5 (1993) setting forth the jurisdiction and powers of the supreme court. HRS § 602–5(1) (1993) specifically provides that "the supreme court shall have jurisdiction and powers ... [t]o hear and determine all questions of law, or of mixed law and fact, which are properly brought before it on any appeal allowed by law from any other court or agency."

9. HRS § 91–14(b) provides in relevant part:

Except as otherwise provided herein, proceedings for review shall be instituted in the circuit court within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency pursuant to rule of court *except where a statute provides for a direct appeal to the supreme court, which appeal shall be subject to chapter 602, and in such cases the appeal shall be in like manner as an appeal from the circuit court to the supreme court,* including payment of the fee prescribed by section 607–5 for filing the notice of appeal (except in cases appealed under sections 11–51 and 40–91). The court in its discretion may permit other interested persons to intervene. (Emphasis added.)

tariff. The carrier argued that the courts, under the doctrine of primary jurisdiction, were without jurisdiction to construe the tariff until the "true construction" was determined by the Interstate Commerce Commission (ICC). *Id.* at 289, 42 S.Ct. 477. The Court rejected this argument and held that "[e]very question of the construction of a tariff is deemed a question of law." *Id.* at 290–91, 42 S.Ct. 477. *See also, Pan Am. Petroleum Corp. v. Superior Court of Delaware,* 366 U.S. 656, 666, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961) (concluding that "the attainment of uniformity does not require that in every case where the construction of a tariff is in dispute, there shall be a preliminary resort to the [ICC]"). Hence, we treat the construction of a tariff as a question of law. *Balthazar,* 109 Hawai'i 69, 123 P.3d 194, 198 (in a customer's action against telecommunication company for unfair trade practices, terms of the applicable tariff treated as a question of law under the filed-rate doctrine).

▮ As to whether a presumption of validity should be extended in this case, a majority of this court stated in *Paul's Elec. Serv., Inc. v. Befitel,* 104 Hawai'i 412, 419, 91 P.3d 494, 501 (2004), that the "unjust and unreasonable" language in HRS § 269–16(a) "does not represent a separate standard of review, but rather represents the application of the abuse of discretion standard to the statutory scheme underlying the PUC's *rate-making* powers." (Emphasis added.) Furthermore, it was indicated that "[a]gency determinations, even if made within the agency's sphere of expertise, are not presumptively valid"; except "an agency's discretionary determinations are entitled to deference, and an appellant has a high burden to surmount that deference." *Id.* Inasmuch as no issue arises as to the exercise of discretion by the Commission in this case, *see* discussion *infra,* the presumption of validity as to the Commission's decision does not apply.

## X.

▮ Generally, tariffs are "public document[s] setting forth services being offered; rates and charges with respect to services; and governing rules, regulations, and prac-

tices relating to those services." *Adams v. Northern Illinois Gas Co.,* 211 Ill.2d 32, 284 Ill.Dec. 302, 809 N.E.2d 1248, 1263 (2004). *See also George E. Failing Co. v. Watkins,* 14 P.3d 52, 54 n. 3 (Okla.2000) (defining "tariff," *inter alia,* as " '[a] schedule listing the rates charged for services provided by a public utility ... a business (esp. one that must by law file its rates with a public agency)[,]' (*Black's Law Dictionary* 1468 (7th ed.1999)); [and] 'a table of fixed charges' (*The Oxford American Dictionary & Language Guide* 1032 (1999))").

As explained in *Balthazar,* although the filed rate doctrine was originally applied in cases where an entity filed rates with a federal agency, the doctrine has been extended to all forms of regulated utilities and applies where rates are filed with a state agency. *Balthazar,* 109 Hawai'i 69, 123 P.3d 194, 198. *See Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211, 216 (Tex.2002) (stating that the filed rate doctrine "applies when state law creates a state agency and a statutory scheme under which the agency determines reasonable rates for the service provided" (citing *Arkansas La. Gas Co. v. Hall,* 453 U.S. 571, 579, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981))); *Teleconnect Co. v. U.S. West Communications, Inc.,* 508 N.W.2d 644, 648 (Iowa 1993) (applying the filed tariff doctrine where the Iowa legislature and the utilities board established a "uniform tariff regime"); *Richardson v. Standard Guar. Ins. Co.,* 371 N.J.Super. 449, 853 A.2d 955, 963 (Ct.App. Div.2004) (stating that the "filed rate doctrine ... has also been held to apply to rates established by state agencies").

▮ Pursuant to the "doctrine, filed tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside." *Southwestern Elec.,* 73 S.W.3d at 217. *See also Brown v. MCI Worldcom Network Servs., Inc.,* 277 F.3d 1166, 1170 (9th Cir.2002) (stating that "[o]nce a tariff is approved, it binds both carriers and shippers with the force of law" (quotation marks and citations omitted)). *See also Balthazar,* 109 Hawai'i 69, 123 P.3d 194, 198 (explaining that "neither the tort of the carrier nor the existence of a contract will work to vary or enlarge the rights de-

fined in a tariff" (citing *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 164, 43 S.Ct. 47, 67 L.Ed. 183 (1922))). *But see U.S. West Communications, Inc. v. City of Longmont*, 948 P.2d 509, 515 (Colo.1997) (rejecting analysis of intermediate court of appeals that "interpreted the tariff as if it were a statute" in dispute where tariff and municipal ordinance were in conflict).

 Additionally, "notice of the terms and rates established in a filed tariff is imputed to customers." *Balthazar*, 109 Hawai'i 69, 123 P.3d 194, 198 (citing *Evanns v. AT & T Corp.*, 229 F.3d 837, 840 (9th Cir.2000)). *See also Teleconnect Co.*, 508 N.W.2d at 647 (stating that "[t]he filed tariff doctrine conclusively presumes that both a utility and its customers know the contents and effects of published tariffs" (citing *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 n. 9, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990))) (other citation omitted). It is established that "[t]he filed-rate doctrine ... does not preclude courts from interpreting the provisions of a tariff and enforcing that tariff," *Brown*, 277 F.3d at 1171–72, and that "[i]f the filed-rate doctrine were to bar a court from interpreting and enforcing the provisions of a tariff, that doctrine would render meaningless the provisions of the [Federal Communications Act] allowing plaintiffs redress in federal court," *id.* at 1172.

### XI.

 We conclude the Commission erred in directing the refund of $681,400 to the developers inasmuch as the filed-rate doctrine applies and the CIAC funds collected by Appellant were nonrefundable as set forth in Appellant's tariff.[10] *See Balthazar*, 109 Hawai'i 69, 123 P.3d 194, 201 (applying the filed-rate doctrine in a case involving a public utility subject to the authority of a state regulatory agency pursuant to HRS § 269–

16). As mentioned previously, Section 1 of Rule XI, Appellant's tariff, provided that "[a]s a condition of receiving a service or substantially increasing sewage outflow volume from new or substantially modified facilities, developer and commercial applicants shall be required to pay a *non-refundable* contribution in aid of construction to the Company." (Emphasis added.) The language employed in Section 1 of the tariff expressly prohibited refunds of CIAC. Section 6 of Rule XI also specified the CIAC amount as $9.50 per gallon EDSD. Exhibit E, which was submitted in support of the tariff, indicated that $2.25 of the CIAC amount of $9.50 was for the purpose of paying income taxes owed because of the receipt of construction funds. The non-refundability and CIAC-specific amount provisions in the tariff are not contested. If the Commission had intended any portion of the $9.50 CIAC amount to be refundable upon some condition, a section providing so could have been included in the tariff itself. Because it was not, pursuant to the plain language of the tariff, the CIAC payment was not refundable.

### XII.

As mentioned before, the Commission and the Consumer Advocate[11] assert that (1) the amount of $681,400, representing that portion of the CIAC charge not directly paid to tax authorities, is not CIAC and (2) thus the Commission correctly directed Appellant to refund such balance. In support of its position, the Commission relies on, *inter alia*, Exhibit E, Appellant's CIAC study, to establish that $2.25 of the $9.50 per gallon EDSD rate represented the amount "set aside for income taxes payable" and such taxes were not paid out.

Appellant does not dispute that the $9.50 per gallon EDSD rate incorporated $2.25 per gallon for income taxes. However, Appellant

10. Sections XI and XII address Appellant's arguments 1(a), (b), (d), (e) and (f), the Commission's arguments 1(a) and (b), and the Consumer Advocate's arguments 1 to 4.

11. Additionally, the Consumer Advocate argues that the doctrine is inapplicable to this appeal because allowing Appellant to keep the disputed

$681,400 amount does not "further" "the public policy behind the filed[-]rate doctrine [which] is to prohibit discrimination in pricing practices." Inasmuch as the express, unambiguous language of Section 1 of Rule XI provides that CIAC is nonrefundable, it controls. *See* discussion *infra*.

maintains, *inter alia*, that (1) its tariff expressly identifies the $9.50 per gallon EDSD rate as the CIAC amount which is a "nonrefundable" fee, (2) the remaining balance of $681,400 has nothing to do with the $2.25/gallon tax component ($457,210), (3) one of the costs associated with Appellant's receipt of the plant is the tax associated with it, and (4) if the Commission is correct that the $2.25 amount identified as payable for income taxes is not CIAC, "there is no principled basis ... to conclude that other component parts, [*i.e.,*] the $1.02 financing component, are CIAC."

The Commission's position ignores the non-refundability and CIAC-specific amount provisions of Sections 1 and 6 of Rule XI, respectively, and would render such provisions meaningless. Inasmuch as a tariff has the "force and effect of law," *Southwestern Elec.*, 73 S.W.3d at 217, this court is bound by the "cardinal rule of statutory construction ..., if rational and practicable, to give effect to all parts of a statute, and ... no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *Coon v. City & County of Honolulu*, 98 Hawai'i 233, 259, 47 P.3d 348, 374 (2002). To "refund" money is "to return money in restitution or repayment." *Black's Law Dictionary* 1281 (6th ed.1990). "Refundable" is defined as "capable of being refunded." *Webster's Third New Int'l Dictionary* 1910 (1961). "Nonrefundable" means "not subject to refunding or being refunded." *Merriam Webster's Collegiate Dictionary* 791 (10th ed.1993).

Hence, adopting the Commission's position that $2.25 of the $9.50 CIAC amount was refundable would "void" the term "non-refundable" as used in Section 1 of the tariff. *See Balthazar*, 109 Hawai'i 69, 123 P.3d 194, 204 (explaining that "a court should avoid interpreting a tariff in a manner that would nullify specific or substantial provisions"). The Commission therefore wrongly concluded that the disputed remaining $681,400, which represented that portion of the $9.50 CIAC amount payable toward income taxes, is refundable.

## XIII.

The Commission maintains that the $2.25 portion of the $9.50 EDSD rate collected by Appellant was not CIAC because it was "set aside for income taxes payable." Similarly, the Consumer Advocate also argues that "[b]y keeping separate accounts for the CIAC collected and another for the income tax portion collected from developers in an income taxes payable account, [Appellant] acknowledged the difference in the amounts collected." However, Appellant's allocation of certain portions of the $9.50 EDSD to separate accounts, such as the income taxes payable account, is not dispositive of whether the $2.25 portion of the EDSD rate is to be refunded.

For, "[t]he [filed-rate] doctrine applies to more than just rates; it extends to the services, classifications, charges, and practices included in the rate filing." *Stand Energy Corp v. Columbia Gas Transmission Corp.*, 373 F.Supp.2d 631, 635 (S.D.W.Va. 2005). Moreover, where a tariff is unambiguous the parties are bound by its terms. *Balthazar*, 109 Hawai'i 69, 123 P.3d 194, 203 (holding that customer could not escape tariff-imposed obligation under tariff's plain and unambiguous language).

The Section 6 definition of the CIAC fee as an amount of $9.50 per gallon of EDSD is part of the tariff. As mentioned previously, Appellant calculated this amount "by finding the fee which minimized financing charges over time and did not build cash reserves in [Waikoloa Sanitary Sewer Company]." To repeat, the proposed fee of $9.50, which was approved by the Commission, was the sum of the sewage treatment plant capacity expense of $4.94, the primary collection expense of $1.29, the financing expense of $1.02, and the income tax expense of $2.25. Appellant's tariff is unambiguous inasmuch as it defines the CIAC as $9.50 per gallon of EDSD. Given that the tariff is clear in this respect, that Appellant may have allocated certain portions of the total CIAC to different accounts or categories in its accounting records is not determinative of whether the $2.25 income tax expense per gallon of EDSD collected was part of the CIAC fee. Based

upon the plain language of the tariff, we conclude that the CIAC fee included a portion to pay income taxes.

## XIV.

The Commission also argues that the $2.25 portion of the per gallon EDSD fees allocated for income taxes "was not used for the construction of new or expanded plant facilities." Likewise, the Consumer Advocate maintains that "Appellant may have violated its own tariff by using money collected as CIAC for purposes other than those stated in its tariff." The Consumer Advocate argues that if the filed-rate doctrine were applicable, it would limit Appellant's use of the CIAC funds to those uses described under Rule XI Section 2.

The Consumer Advocate thus suggests that "[t]he tariff did not allow for the use of CIAC funds to pay for income taxes." As previously set forth, Rule XI Section 2 states that CIAC is used "to install or *pay for new or expanded sewage treatment plant facilities* " and enumerates a list of specific examples or purposes such as "[c]onstruction of new percolation ponds and injection wells[.]" (Emphasis added.) Given that the term "including" precedes the enumeration of uses for the CIAC payments, the list is not an exclusive or exhaustive rendition of the purposes for which CIAC may be used. "[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,* 314 U.S. 95, 99–100, 62 S.Ct. 1, 86 L.Ed. 65 (1941) (citing *Phelps Dodge Corp. v. Nat'l Labor Relations Bd.,* 313 U.S. 177, 189, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)) (interpreting Section 26 of the Federal Farm Loan Act, 12 U.S.C.S. §§ 931–933).

Thus, Appellant does not violate its tariff by using CIAC to pay income taxes despite the fact that such use is not specifically designated in the list. The Commission and the

Consumer Advocate do not consider using CIAC to pay income taxes as "install[ing] or pay[ing] for new or expanded sewage treatment plant facilities." In contrast, Appellant argues that "one of the costs associated with [Appellant's] receipt of the plant is the tax associated with it."

In the instant case, we discern no ambiguity in Rule XI Section 2 with respect to whether CIAC may be used to pay income taxes. Appellant's use of CIAC payments to pay taxes constitutes "pay[ing] for new or expanded sewage treatment plant facilities." We agree with Appellant that, in light of Exhibit E and the adoption of Tariff 1, a "cost[ ] associated with [Appellant's] receipt of the plant is the tax associated with it." For, insofar as income tax consequences arose from Appellant's receipt of construction funds used to expand or construct additional facilities, those income tax expenses are costs associated with "pay[ing] for new or expanded sewage treatment plant facilities." Thus, the Consumer Advocate's argument that Appellant violated the tariff by using CIAC payments to pay income taxes is not persuasive. We therefore hold that the Commission's finding that Appellant's remaining balance allocated for income taxes was not part of the CIAC fee is clearly erroneous in light of Exhibit E and the tariff.

## XV.

To the extent that the Commission's and the Consumer Advocate's second argument on appeal that Appellant's "NOL argument is irrelevant to the CIAC tax gross-up issue" advances an interpretation of Appellant's tariff, this argument is discussed.[12] Appellant maintains that it is "unjust and unreasonable" for the Commission to require Appellant to "refund the monies collected for those taxes" where Appellant "used shareholder-owned NOL to pay the Developer's [sic] [t]ax [l]iability throughout the 1987–1996 time period." [13] The Commission rejects this argu-

---

12. This section addresses Appellant's argument 1(c), the Commission's argument 2, and the Consumer Advocate's argument 5.

13. The Consumer Advocate states that Appellant indicated the $681,400 balance was " 'a source of funds from which regulatory assets were pur-

chased.' " The Commission maintains that *"[i]f this is true"* then Appellant *"failed to make a corresponding adjustment to its test year ... net plant in service."* (Emphasis added.) This matter is not further discussed, and the parties devote their argument to the use of NOL as a setoff

ment as "irrelevant" while the Consumer Advocate states that this argument "obfuscates proper regulatory treatment of CIAC income tax expense." [14]

The Commission asserts that under Appellant's "erroneous approach" of "utiliz[ing] its NOL to reduce its income tax liability," Appellant "was not required to remit to the taxing authorities the entire gross-up amounts it collected under the full gross-up method .... [and] was somehow entitled to retain the $681,400 balance for its own use." The Consumer Advocate explains that although Appellant made a "financial and tax decision to apply NOL to reduce the income taxes due on the CIAC contributions," "[t]he fact remains that [Appellant] collected monies from developers for a specific purpose, that is, to pay for income taxes, and these amounts were not paid to the taxing authorities."

In response, Appellant acknowledges that it "used the [t]ax [c]omponent funds to reimburse itself for its use of shareholder-owned NOL to pay the [t]ax [l]iability, rather than paying the [t]ax [c]omponent directly to the [t]ax [a]uthorities," but that this practice is proper as NOL were used "as an 'advance' on the tax payment that needed to be and was reimbursed to the shareholder."

The treatment of CIAC for ratemaking purposes, including the allocation of income tax obligations for CIAC, *i.e.*, whether the utility should pay these obligations directly or whether contributors of CIAC should pay these obligations through a "gross-up" on their CIAC amounts, was the subject of Docket No. 7287 opened in April 1992. As mentioned before, the Commission closed its investigation in this docket without issuing a decision on this issue. The Commission simply noted these matters were "moot" and that "since the inception of this docket," the Commission had determined the treatment of CIAC to be "reasonable" in other rate proceedings.

Appellant maintains that it "would not have used its NOL .... [i]f the Commission had held in 1992 that any unpaid taxes would need to be refunded." To the extent that the Commission's and the Consumer Advocate's position characterizes Appellant's retention of the CIAC funds to be in conflict with the terms of the tariff, their position is inconsistent with the plain language of the tariff. The tariff does not contain provisions prohibiting Appellant from using NOL to offset Appellant's tax liabilities incurred from the construction of new facilities funded by CIAC. Because there is no tariff provision prohibiting the use of shareholder NOL to offset Appellant's tax liability, there is no conflict in the tariff provisions that must be addressed.

· XVI.

The second issue on appeal involves the Commission's alleged miscalculation of Appellant's Test Year income taxes that "in turn, results in the miscalculation of the Additional Revenues that [Appellant] is allowed to recover" under the Commission's Decision and Order No. 19223.[15] Appellant argues that the Commission understated Total Sewer Revenue by $36,021 which resulted in an $11,307 understatement of income tax.

Appellant maintains that such understatement "resulted in a revenue requirement $17,605 lower than necessary to provide the allowable net income of $118,697 and a return of 10%." Therefore, Appellant requests that this be remanded to the Commission and that the Commission be directed to (1) correct its miscalculation, (2) recognize a Total Return Requirement of $757,988 ($740,383 + $17,605), (3) allow total Additional Revenues of $157,570 ($139,965 + $17,605), and (4) permit Appellant to amend its Tariff accordingly.

The Commission asserts that Appellant is not entitled to any relief with respect to the

against the CIAC income taxes collected. Thus, we do not express an opinion as to this issue.

14. Appellant maintains that receipt of CIAC increases its potential tax liability in response to its perception that the Commission contends that such receipt does not adversely affect Appellant.

Because we need not address Appellant's argument, we do not reach Consumer Advocate's argument 5 that Appellant's argument was untimely.

15. This section focuses on Appellant's argument 2 as well as the Commission's argument 3.

miscalculation issue because "[Appellant] failed to file a timely motion for reconsideration of Decision and Order No. 19223, pursuant to [Hawai'i Administrative Rule] § 6–61–137" with respect to that issue. It also contends that Appellant is not entitled to relief because Appellant has violated Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4).[16] The Commission cites *Bitney v. Honolulu Police Dept.*, 96 Hawai'i 243, 251, 30 P.3d 257, 265 (2001), for the proposition that appellate courts may not consider an issue that a party failed to raise below unless the interests of justice so require. *Bitney* indicates that in deciding whether to consider issues raised for the first time on appeal, an appellate court must determine "whether consideration of the issue requires additional facts; whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and whether the question is of great public importance." *Id.* (internal quotation marks and citations omitted).

Review of the miscalculation issue requires that additional facts be considered. The underlying rationale for this factor is "that an appellate court should not review an issue based upon an undeveloped factual record." *Liftee v. Boyer*, 108 Hawai'i 89, 98, 117 P.3d 821, 830 (App.2004) (quoting *Montalvo v. Lapez*, 77 Hawai'i 282, 290–91, 884 P.2d 345, 353–54 (1994)). Resolution of Appellant's miscalculation issue for the first time on appeal would compromise the integrity of the

Commission's previously rendered findings and therefore weighs against this court's recognition of plain error. *See Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 56 Haw. 466, 476, 540 P.2d 978, 985 (1975) (recognizing plain error based upon the observation that "[t]he consideration of this issue raised for the first time on appeal will not affect the integrity of any findings of fact of the trial court"). It does not appear that the miscalculation issue involves a question of great public importance. For the aforementioned reasons we decline to review the miscalculation issue inasmuch as Appellant failed to raise this issue in earlier proceedings with the Commission.

### XVII.

Accordingly, the Commission's February 27, 2002 decision and order and the April 10, 2002 order denying Appellant's motion for reconsideration are reversed and Appellant's miscalculation appeal is dismissed, and this case is remanded to the Public Utilities Commission for appropriate disposition.

---

16. HRAP Rule 28(b)(4) states in relevant part as follows:

(b) Opening brief. Within 40 days after the filing of the record on appeal, the appellant shall file an opening brief, containing the following sections in the order here indicated:

. . . .

(4) A concise statement of the points of error set forth in separately numbered paragraphs.

Each point shall state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency.