318 P.3d 97

**PACIFIC LIGHTNET, INC., Petitioner/Plaintiff–Appellant/Cross–Appellee**

v.

**TIME WARNER TELECOM, INC., and Time Warner Telecom of Hawai'i L.P., Respondents/Defendants–Appellees/Cross–Appellants.**

No. SCWC–28948.

Supreme Court of Hawai'i.

Dec. 18, 2013.

260

Margery S. Bronster, and Rex Y. Fujicha-ku, Honolulu, for petitioner.

J. Douglas Ing, Brian Kang, and Emi L.M. Kaimuloa, Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by ACOBA, J.

We hold that, first, the circuit court of the first circuit (the court) erred in invoking the primary jurisdiction doctrine to dismiss the

instant case. Second, inasmuch as the filed-rate doctrine applies, the court erred in failing to instruct the jury that Petitioner/Plaintiff–Appellant/Cross–Appellee Wavecom Solutions Corporation, formerly known as Pacific Lightnet, Inc. (PLNI) could not recover for any claims involving charges not filed within 120 days of receipt of billing, in accordance with the Hawai'i Public Utilities Commission (PUC) and Federal Communications Commission (FCC) filed tariffs.

Accordingly, we affirm in part and vacate in part the February 21, 2013 judgment of the Intermediate Court of Appeals (ICA), filed pursuant to its January 25, 2013 Memorandum Opinion, vacate the court's October 23, 2007 order granting the Motion to Dismiss for Lack of Subject Matter Jurisdiction filed by Respondent/Defendants–Appellees/Cross–Appellants Time Warner Telecom, Inc. and Time Warner Telecom of Hawai'i L.P. (Time Warner) on September 4, 2007, and vacate in part the court's December 12, 2007 judgment.

## I. Background

The instant appeal involves a dispute between two telecommunications carriers. Time Warner is a telecommunications carrier that provides voice, internet and data services. As part of these services, Time Warner provides "call termination services," which is the ability for customers of one carrier to make and complete calls to customers of Time Warner. The dispute in this case relates to call termination services that were allegedly provided by Time Warner.

The claims in this case consist of two separate billing disputes between the carriers over the call termination services. The two claims are called collectively, "Feature Group D claims." First, PLNI claims that Time Warner owes it a credit for certain past charges. Second, PLNI contests certain charges by Time Warner for services that it allegedly never received. The background facts relevant to these two claims follow.

## A. GST's Sale to Time Warner

GST Telecommunication, Inc. (GST) was a telecommunications company that filed for Chapter 11 bankruptcy on May 17, 2000. In September 2000, Time Warner agreed to purchase certain assets of GST in bankruptcy, including GST's mainland telephone network. The acquisition was made pursuant to an asset purchase agreement between Time Warner and GST, dated September 11, 2000. According to Time Warner, the asset purchase agreement gave it "all Carrier Identification Codes (a.k.a. CICs)." CICs are used to identify telephone calls associated with a certain carrier.[1]

Time Warner did not purchase all of GST's assets, but rather, GST retained for later sale the assets of GST Hawaii's operations, including all rights to what the asset purchase agreement called "Feature Group D" accounts. Time Warner maintains that although it acquired the Carrier Identification Codes from GST, GST recognized that it was still responsible to pay Time Warner the outstanding balance under certain CICs for services that GST customers had previously received.

## B. GST's Sale to PLNI

In March 2001, TM Communications Hawai'i (TM) agreed to purchase, *inter alia*, the remainder of the GST assets in Hawai'i that were not previously sold to Time Warner. PLNI is a subsidiary of TM.[2] The asset purchase agreement between GST and TM, dated March 9, 2001 stated that TM had purchased:

> [A]ll of the [GST's] rights, title, and interests in and to the Business, including, without limitation, in and to all the assets, properties, rights, accounts receivable and Assumed Contracts of [GST] and claims of [GST] related to the Business. . . .

## C. Customer Investigation Forms and Dispute Submissions Filed with Time Warner

On September 18, 2001, PLNI and/or its predecessor GST Hawai'i filed a "Customer

---

1. CICs presumably entitle their holder to collect payment for certain call termination services.

2. The parties do not make any arguments based on the parent-subsidiary relationship between TM and PLNI, and as noted *infra*, TM eventually assigned its rights in the asset purchase agreement to PLNI.

Investigation Form" with Time Warner requesting that Time Warner investigate and resolve PLNI's claim for disputed invoice amounts relating to "Feature Group D" services. The Customer Investigation Form listed the "Disputed Amount[s]" as $30,760.16, "All Invoices $200,000[,]" and "All Invoices[.]"

## D. Assignment by TM to PLNI

TM assigned its rights in the asset purchase agreement with GST to PLNI in October 2001. According to Time Warner, under PLNI's assumed asset purchase agreement, PLNI was informed of Time Warner's purchase of GST assets, as well as which assets were covered by PLNI's purchase. Time Warner states that Section 1.2 of the asset purchase agreement "provided that [PLNI] was not acquiring any assets that had been conveyed to [Time Warner]," and that this meant that "excluded from PLNI's purchase were 'all Carrier Identification Codes' that Time Warner had acquired." Time Warner asserts that, pursuant to the plain language of PLNI's assumed asset purchase agreement, PLNI did not acquire CICs 5756, 5478 or any other Carrier Identification Codes.

## E. Time Warner's Alleged Resolution of Dispute with GST

On June 1, 2002, according to Time Warner, Time Warner and GST resolved the billing dispute over pre-October 2001 call termination services received. Time Warner states that, "[b]ased on proper certification from GST, [Time Warner] credited GST's account $327,714.03 for end user taxes that should not have been charged, and GST paid the remaining balance due and owing." Time Warner notes that "as [Time Warner] was still providing transition services for GST under the asset purchase agreement between Time Warner and GST, including housing certain GST divisions [such as] GST's billing services, the notice of the $327,714.03 credit was sent to GST, via Time Warner's street address."

According to Time Warner, on August 7, 2002, any dispute regarding who owned certain Carrier Identification Codes was resolved by GST when it assigned CIC 5478 to PLNI via Time Warner's Consent and Agreement to Assign Service. Time Warner asserts that CIC 5756, as well as all other Carrier Identification Codes remained with Time Warner pursuant to the terms of the original asset purchase agreement executed between GST and Time Warner.

## II. Circuit Court Proceedings

## A. Pre–Trial Proceedings

On December 30, 2003, PLNI filed a complaint and motion for preliminary injunction in the court against Time Warner, alleging, *inter alia*, that:

34. On September 18, 2001, [PLNI] filed a dispute on defendants' customer-investigation form for erroneous billings and payments concerning Feature Group D services that defendants never provided to either [PLNI] or GST. As of December 4, 2003, defendants indicated they were still processing this claim, which, according to [PLNI's] calculation, will result in a $230,760.16 credit in [PLNI's] favor.

. . . .

41. [Time Warner] ha[s] wrongfully misbilled [PLNI] for services defendants never provided, and are liable to [PLNI] for damages in an amount that exceeds $200,000, but which amount will be more precisely proved at trial.

PLNI additionally asked for "money damages based on [Time Warner's] wrongful actions in . . . © mis-billing [PLNI] for Feature Group D services [Time Warner] never provided."

On June 22, 2005, PLNI filed with Time Warner the first of another series of Billing Dispute Submissions relating to disputed invoices. Specifically, PLNI claimed that it was billed on several account numbers for Feature Group D services that it did not receive.

On November 13, 2006, PLNI filed its pretrial statement stating, *inter alia*, that Time Warner "misbilled [PLNI] for other telecommunications services" and that Time Warner was "liable to [PLNI] for damages in an amount that exceeds $200,000." March 20, 2007, at the court's direction, both parties

filed motions for summary judgment regarding some of the claims in PLNI's complaint. This did not include the Feature Group D claims. The court entered summary judgment in favor of Time Warner. According to Time Warner, the parties' action then focused on the remaining claims, which at this point Time Warner believed <u>did not</u> include the Feature Group D claims.

On July 16, 2007, Time Warner filed a motion seeking, among other things, dismissal of the Feature Group D claims on the basis that they had been resolved. On July 27, 2007, PLNI filed its opposition, alleging that the Feature Group D claims had not been "satisfactorily resolved." On August 15, 2007, the court issued an order denying Time Warner's motion in part, and allowing PLNI to proceed with its Feature Group D claims.

On August 20, 2007, PLNI submitted to Time Warner a proposed Short Impartial Statement of the Case, which provided, in relevant part that:

> [PLNI] asserts claims against [Time Warner] for billing [PLNI] approximately $138,000 to date for a telecommunications switching service called Feature Group D, which [Time Warner] purported to supply to [PLNI], but which [PLNI] has not received from [Time Warner]. [Time Warner] denies having improperly billed [PLNI].

Based on the court's rulings up to this point, PLNI asserted that the only remaining dispute for trial was the Feature Group D claim. On August 27, 2007, Time Warner filed its motion in limine, seeking to exclude evidence regarding elements of the Feature Group D dispute that had not been asserted in the December 30, 2003 complaint and of which [Time Warner] alleged it had not been given adequate notice (Motion in Limine).

On August 30, 2007, Time Warner filed an Answer to [PLNI']s original complaint (Answer). This answer asserted a number of affirmative defenses, including that "[PLNI's] claims are barred by the filed tariff doctrine."

The court denied Time Warner's Motion in Limine on August 31, 2007, which, Time Warner points out, was the last business day before the start of trial.

Also on August 31, 2007, PLNI filed a Motion to Strike Time Warner's Answer (Motion to Strike). PLNI's memorandum in support of its Motion to Strike stated that Time Warner had, "[w]ithout first moving for leave of the [c]ourt," filed its answer "three years and eight months after [PLNI] filed its complaint and two business days before the start of trial . . . ."

On September 4, 2007, Time Warner submitted a motion to dismiss for lack of subject matter jurisdiction on the basis that the only remaining issues in the case, the Feature Group D claims, were of a technical nature requiring the expertise of the PUC.

### B. Jury Trial

A jury trial commenced the same day. On September 11, 2007, over Time Warner's objection, the jury was provided with a special verdict form addressing contract issues.[3] Time Warner points out that the court refused to give the jury instructions on the law of tariffs, which it claims govern Feature Group D issues.[4]

---

**3.** Time Warner's Amended Proposed Special Verdict Form stated as follows, in pertinent part:

> Question No. 1. Is Pacific LightNet entitled to GST Hawaii's claim for the billing dispute submitted by GST Hawai'i to Time Warner Telecom on September 18, 2001?
>
> Yes ____ No ____
>
> If you answered Question No. 1 "Yes", then go on to answer Question No. 2. If you answered Question No. 1 "No", do not answer any further questions in Part A, but go on to Part B.

**4.** Time Warner requested that the court provide the jury with a number of supplemental jury instructions. These included, *inter alia:*

> Telecommunications Rules—Fair Compensation for Call Termination
>
> Telecommunications carriers must be compensated on a fair basis for terminating calls from another carrier's customers. This includes the reasonable and necessary costs, as prescribed by law under tariff, of the telecommunications carrier in providing the services in question.
>
> Telecommunications Rules—Compensation for Termination Services Received

264

The record indicates that the jurors were given, *inter alia*, the following instruction:

Instruction No. 13: Telecommunications Rules—Tariff Compliance[5]

Telecommunications carriers are required to file tariffs with the Federal Communications Commission and the Hawai'i Public Utilities Commission. These filed tariffs govern the telecommunications carriers' services, rates, and charges. Telecommunications carriers and their customers are required to comply with these tariffs. [Handwritten as follows] The tariffs are both contracts and the law.

The tariffs were introduced into evidence as Trial Exhibit D–2 and D–3.

The jury returned a verdict in favor of PLNI in the amount of $327,714.03 in damages resulting from the credit that was allegedly owed to PLNI. With respect to the overcharge claim, the jury found that there was a breach of contract, awarded $1.00 nominal damages for breach of contract, and

Pacific LightNet, Inc. is required by law to pay Time Warner Telecom for call termination services that Pacific LightNet, Inc. and its customers received.
Telecommunications Rules—Tariff Compliance
Telecommunications carriers are required to file tariffs with the Federal Communications Commission and the Hawai'i Public Utilities Commission. These filed tariffs govern the telecommunications carriers' services, rates, and charges. Telecommunications carriers and their customers are required to comply with these tariffs.
Telecommunications Rules—Tariff Content
Time Warner Telecom has filed tariffs with the Federal Communications Commission and the Hawai'i Public Utilities Commission as required by law. Time Warner Telecom's tariffs govern the rates, terms, and conditions for call termination of other carrier's customers.
Telecommunications Rules—Tariff Compliance
Pacific Lightnet, Inc., as a telecommunications carrier who receives call termination services from Time Warner Telecom, is required by law to comply with the terms of Time Warner Telecom's tariffs.
Tariff—Billing Dispute Procedures
By law, any objections to billed charges must be reported to Time Warner Telecom within 120 days of the receipt of the billing, or such claims are waived. All claims objecting to billing must include supporting documentation.
If the claim is timely filed and supporting documentation is provided, Time Warner Telecom is required to make adjustments to the

determined that PLNI's outstanding bills owed to Time Warner for Feature Group D services should be reduced by $118,109.58. The jury special verdict form stated as follows:

Question No. 1. Did Plaintiff Pacific Lightnet, Inc. prove breach of contract by Defendants regarding the billing dispute submitted on September 18, 2001? [6]

Yes X No ____

If you answered Question No. 1 "Yes", then go on to answer Question No. 2, if you answered Question No. 1 "No", go on to Question 3.

Question No. 2. What are the damages for this breach of contract?

$ 327,714.03

Go on to Question No. 3.

Question No. 3. Did Plaintiff Pacific Lightnet, Inc. prove breach of contract by Defendants regarding Feature Group D billings for any period from October 11, 2001, through the present? [7]

invoices, but only where circumstances exist which reasonably indicate that such adjustments are appropriate.
Tariff—Limitations on Liability of the Carrier
By law, Time Warner Telecom cannot be held liable for any claims arising under its provision of services, including billing disputes over call termination services, that are due to any causes beyond the control of Time Warner Telecom.
Telecommunications Rules–Tariff Cannot Be Altered
The terms within Time Warner Telecom's tariffs cannot be altered without prior approval from the Federal Communications Commission and the Hawai'i Public Utilities Commission
Telecommunications Rules–Tariff Cannot be Altered
If you make an award of any kind to Pacific LightNet, Inc., your award cannot alter, amend, or contradict the terms of Time Warner Telecom's filed tariffs.

5. A handwritten note on the instruction indicates that this instruction was given, as modified, over the objection of Time Warner.

6. Questions 1 and 2 relate to the credits that PLNI was allegedly due, but that Time Warner contended had already been resolved with GST.

7. Questions 3, 4, and 5 relate to claims that PLNI was erroneously charged for services that it allegedly never received, in breach of the contract

Yes X No ___

If you answered Question No. 3 "Yes", then go on to answer Question No. 4. If you answered Question No. 3 "No", do not answer any further questions. Please have the Foreperson sign the Special Verdict Form and call the Bailiff.

Question No. 4. What are the damages for this breach of contract?

$ 1

If you awarded more than $1 in Question No. 4, sign the Special Verdict Form and call the Baliff. If you awarded $1, go on to Question No. 5.

Question No. 5. If you awarded $1 in Question No. 4, state whether Plaintiff Pacific Lightnet, Inc. proved that the pending bills should be reduced and, if so, in what amount.

No ___ Yes X

$ 118,109.58

Please have the Foreperson sign the Special Verdict Form and Call the Baliff.

DATED: Honolulu, Hawai'i, 9/13/07.

C. Post–Trial Proceedings

On September 20, 2007, the court heard Time Warner's motion to dismiss for lack of subject matter jurisdiction that had been submitted prior to trial, on September 4, 2007. At the September 20, 2007 hearing, the court stated near the conclusion of the hearing that it would grant the motion and stay the effect of the verdict:

So what I'll say is in granting the motion on the basis of primary jurisdiction, I'm staying the effect of the verdict but we're going to get this up because we're not going to wait around. That would be ridiculous so that you could take it up as part of the judgment. That's my—I don't think—even if I'm wrong as to how the mechanics of the judgment should look, they'll tell me that too. But I just want it not to be a matter that languishes here for no good reason and then have to do a 54(b)

cert on the summary judgment and send that up. That would be extremely inefficient, don't you agree? I mean, I'm assuming you're going to appeal the summary judgment?

(Emphasis added.)

The court granted the motion to dismiss for lack of subject matter jurisdiction on October 23, 2007. The jury verdict was stayed until further order of the court.

On October 25, 2007, the court entered an order granting in part and denying in part PLNI's Motion to Strike Time Warner's Answer. In the order, the court stated that "[t]he Motion is granted with respect to [PLNI's] request that all affirmative defenses asserted by [Time Warner] in its Answer to [PLNI's] Verified Complaint . . . filed December 30, 2003 . . ., except for the defense of lack of subject matter jurisdiction, are hereby stricken." [8] (Emphases added.)

On November 2, 2007, PLNI filed a Motion for Reconsideration of Order Granting Time Warner's Motion to Dismiss for Lack of Subject Matter Jurisdiction Based on the Primary Jurisdiction Doctrine of the PUC (Motion for Reconsideration of Primary Jurisdiction). In its memorandum in support of the Motion for Reconsideration of Primary Jurisdiction, PLNI argued that the court should stay the proceedings instead of dismissing the Feature Group D Claims. The court denied PLNI's Motion for Reconsideration of Primary Jurisdiction on December 4, 2007.

On December 12, 2007, the court entered its final judgment, stating that the Feature Group D Claims were dismissed on the basis of the primary jurisdiction doctrine, but the enforcement of the jury verdict was stayed until further order of the court. The judgment stated, in relevant part:

On October 23, 2007, the [c]ourt issued its Order Granting Defendants [Time Warner]'s Motion to Dismiss for Lack of Subject Matter Jurisdiction Based Upon the

---

between PLNI and Time Warner. The special jury verdict form indicates that the jury found that there was a breach of contract, awarded $1 as nominal damages for the breach, and found that PLNI had been overcharged by $118,109.58.

8. During trial, it appears that the judge allowed testimony into evidence that was relevant to at least one of these defenses, but the court did not provide instructions to the jury on the defenses.

Primary Jurisdiction Doctrine of the Public Utilities Commission, Filed September 5, 2007. By this Order, the [c]ourt dismissed all of the Feature Group D Claims on the basis of the primary jurisdiction doctrine. Due to the dismissal of all of the Feature Group D Claims, the [c]ourt stayed enforcement of the jury verdict in favor of PLNI on the Feature Group D claims entered on September 13, 2007 until further order of the [c]ourt.

(Emphasis added.) [9]

On December 20, 2007, Time Warner filed a Motion for Judgment as a Matter of Law or Alternatively for New Trial (JMOL Motion). The JMOL Motion stated that, "[t]his Motion is made out of an abundance of caution to preserve [Time Warner]'s rights to appeal the underlying jury verdict, despite the fact that final judgment was ultimately entered in [Time Warner]'s favor based on the primary jurisdiction doctrine and the summary judgment orders, among other things." (Emphasis added.) Time Warner alleged in its JMOL Motion that the "the jury verdict exceeded the bounds of law under the filed tariff doctrine and the law of assignments, and the jury was not properly instructed on certain terms including the affirmative defenses." Time Warner argued that the striking of the affirmative defenses from its Answer contributed to the incomplete jury instructions and permitted the jury to return a verdict that violated the law of the tariffs, and additionally, violated the law of assignments.

On January 14, 2008 PLNI filed its Notice of Appeal with the ICA. On April 14, 2008, Time Warner filed its Notice of Cross–Appeal.

On January 31, 2008, the court held a hearing on the JMOL Motion. The court stated that the JMOL Motion would be dismissed for lack of jurisdiction, because the court had found that it lacked jurisdiction over the Feature Group D claims:

THE COURT: [Counsel for Time Warner], these are your motions. The first one is for judgment as a matter of law or alternatively for a new trial, and that's with respect to what we called the—

[Counsel for Time Warner]: Feature Group D.

THE COURT: Correct, which is what we had the trial for—

[Counsel for Time Warner]: That's correct, Your Honor.

THE COURT:—which I later ruled over objection that there was primary jurisdiction in the PUC, and, therefore, the claim would be dismissed for lack of jurisdiction. So since you are not asking me to change that ruling—are you?

[Counsel for Time Warner]: I am not, Your Honor.

THE COURT: And, therefore, this motion is dismissed for lack of jurisdiction.

. . . .

THE COURT: But if I didn't have jurisdiction, I don't understand how I could possibly grant a new trial or judgment as a matter of law. It's perfectly okay that you brought this motion and that it's been briefed because if I'm wrong on primary jurisdiction, then the judgment would enter consistent with the prevailing party on the verdict and nothing [is] wrong with you preserving your rights through this motion.

. . . .

THE COURT: But, otherwise, I don't see how I could possibly be internally consistent by ruling on the motion.

In accordance with its oral ruling at the hearing, on March 7, 2008, the court filed its order denying Time Warner's JMOL Motion.

### III. ICA Appeal

On appeal to the ICA, PLNI asked, *inter alia*,[10] whether the court erred in dismissing

---

9. Based on the transcript of September 20, 2007 hearing on the motion to dismiss, it appears that the court was unsure as to the appropriate language for the judgment. The judge stated, "even if I'm wrong as to how the mechanics of the judgment should look, [the appellate court] will tell me that too."

10. PLNI raised a total of five points of error in its appeal to the ICA, however, only the one listed is relevant on certiorari to this court, and thus, discussion of PLNI's other points of error is omitted.

the Feature Group D claims on the grounds that primary jurisdiction lay with the PUC, even though the jury had already rendered a verdict in favor of PLNI. PLNI argued that the primary jurisdiction doctrine did not warrant dismissal of the case by the court.

On cross-appeal to the ICA, Time Warner alleged, *inter alia*, that "[t]he jury verdict should be vacated because it is contrary to the law, and consequently, the [ ] [c]ourt erred by denying [Time Warner's] motion for judgment as a matter of law." [11] Time Warner maintained that "[g]ranting judgment as a matter of law/new trial is appropriate when the jury verdict is contrary to the law."

Oral argument was had on June 22, 2011, and the ICA issued its Memorandum Opinion on January 25, 2013. *Pacific Lightnet, Inc. v. Time Warner Telecom, Inc.*, Nos. 28948, 29105, —— Hawai'i ——, 2013 WL 310149, at *1 (Haw.App. Jan. 25, 2013). PLNI's points of error on appeal to this court relate solely to the Feature Group D claims, and thus, the ICA's holding only as to those claims is discussed. *See id.* at *5.

The ICA reviewed *de novo* the question of whether the court properly determined that the PUC had primary jurisdiction. *Id.* It noted that in *Chun v. Employees' Retirement System*, 73 Haw. 9, 828 P.2d 260 (1992), this court "treated primary jurisdiction similar to the question of subject matter jurisdiction." *Id.* (citing *Chun*, 73 Haw. at 14, 828 P.2d at 263). The ICA therefore reasoned that because questions of subject matter jurisdiction are reviewed de novo, that standard of review should also be applied to questions of primary jurisdiction. *Id.* It stated, however, that "if it is determined that primary jurisdiction applies such that [PLNI's] claims should first be addressed in the PUC, we will review for abuse of discretion the [ ] court's decision to dismiss those claims rather than staying the [ ] court proceedings on those claims." *Id.* (citing *Fratinardo v. Emps.' Ret. Sys.*, 121 Hawai'i 462, 469, 220 P.3d 1043, 1050 (App.2009)).

The ICA first considered whether the court properly applied the primary jurisdiction doctrine, concluding that, "[u]nder the regulatory scheme set forth in [Hawai'i Revised Statutes (HRS) ] Chapter 269 and the applicable rules pertaining to the PUC, the issues involved in resolving the Feature Group D claims have been placed within the special competence of the PUC." [12] *Pacific Lightnet*, 2013 WL 310149, at *7. It noted that "because the [ ] court properly recognized the primary jurisdiction of the PUC, the [ ] court was mandated to suspend the judicial proceedings as to the Feature Group D claims." *Id.* at *9.

The ICA additionally concluded that the jury verdict must be vacated pursuant to the filed-rate doctrine. *Id.* at *9. It reasoned that because the tariff provisions, including the 120–day requirement, cannot be waived by the carrier, and Time Warner "was entitled to assert under the tariffs that certain portions of the Feature Group D claims were barred under the 120–day requirement[,]" an issue which the jury did not consider, the jury verdict violated the filed-rate doctrine. *Id.* at *9–10.

Then, the ICA considered whether the court's remedy of dismissal was appropriate, holding that the court did not abuse its discretion in dismissing, rather than staying, the Feature Group D claims. *Id.* at *11–12. The ICA clarified that "the dismissal is without prejudice to PLNI asserting the Feature Group D claims in the PUC." *Id.* at *12.

## IV. Application for Certiorari

In its Application, PLNI asks first, whether "the ICA err[ed] in affirming [the court's] application of the primary jurisdiction doctrine post-trial in deference to the [PUC], where the PUC's statute does not place 'special competence' over billing disputes in the agency and the jury was capable of rendering a special verdict based on the factual

---

11. The remaining points of error alleged by Time Warner in its Opening Brief are not relevant to this appeal.

12. The ICA also reasoned that the issues of fact in the case required the PUC's technical exper-

tise. *Pacific Lightnet*, 2013 WL 310149, at *7. Although the ICA characterized this as the "filed-rate doctrine", *id.*, this consideration would be relevant to the question of primary jurisdiction, as indicated *infra*.

evidence at trial?". (Emphasis added.) Second, PLNI inquires whether "the ICA err[ed] in ruling that the jury's verdict must be vacated because it violated the filed-rate doctrine, where the jury was instructed on the terms and effect of the tariff by [the court], and the rates, terms and reasonableness of the tariff were never challenged?" (Emphasis added.) [13]

With respect to its first point of error, PLNI's Application argues that "there is no specific statutory mandate that directs that the PUC must handle billing disputes which may arise between a carrier and its customers." (Emphasis in original.) On this point, PLNI maintains that the jury could resolve the factual issues in this case without need for the PUC's technical expertise.

As to its second point of error, PLNI argues that this court's decision in *Balthazar v. Verizon Hawai'i, Inc.*, 109 Hawai'i 69, 123 P.3d 194 (2005), recognized that the filed-rate doctrine does not always apply where tariffs are implicated. PLNI claims that "the [ ] court, and the jury as trier of fact, could and did in fact correctly interpret and enforce the tariff." PLNI contends that "there was no danger that the jury was unaware of the 120–day provision in the tariff." In PLNI's view, the difference of $118,109.08 between what was actually awarded and PLNI's requested amount of damages "shows that the jury may have discounted the amount sought based on the 120–day rule in the tariff[,]" and thus, "[t]he verdict should stand."

In response, Time Warner argues that dismissal pursuant to the primary jurisdiction doctrine is appropriate because the Feature Group D claims required resolution of issues that were " 'placed within the special competence of an administrative body[,]' " (quoting *Kona Old Hawaiian Trails Grp. v. Lyman*, 69 Haw. 81, 93, 734 P.2d 161, 162 (1987)), and that the jury verdict violates the filed-rate doctrine and should be vacated. Time Warner avers, *inter alia*, that the time limitations within which to dispute a carrier's billing must be adhered to, including the 120–day limitation in the POC's tariffs, and that the

jury verdict did not consider this rule, because the jury was not instructed on the law of tariffs.

In its Reply, PLNI emphasizes that there was no need for a technical analysis of call records or carrier identification codes to establish a foundation for PLNI's right to the credit and that the PUC does not have special statutory competence in resolving billing disputes. Further, it characterizes Time Warner's objections to the Feature Group D claims verdict as essentially an assault on the competence of the jury to weigh the evidence and make credibility determinations. Finally, it avers that the jury properly took the tariffs into consideration because the jury was instructed that the tariffs provided the applicable law and had the actual tariffs, including the 120–day limit provision, as trial exhibits.

## V. Overview of the Primary Jurisdiction and Filed–Rate Doctrines

The instant case implicates two doctrines that both relate to conflicts involving public utilities—the doctrine of primary jurisdiction and the filed-rate doctrine. Although the two doctrines often arise in the same cases, they are conceptually distinct and each doctrine is applied differently.

### A. Primary Jurisdiction Doctrine

The doctrine of primary jurisdiction is generally applicable to all areas where administrative agencies exercise expertise. In *Kona Old*, this court stated that "[p]rimary jurisdiction ... comes into play whenever enforcement of the claim requires the resolution of issues which, under the regulatory scheme have been placed within the special competence of an administrative body[.]" 69 Haw. at 93, 734 P.2d at 168 (emphasis added) (internal quotation marks omitted) (quoting *United States v. Western Pac. R.R.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). Primary jurisdiction is "conceptually analogous" to the doctrine of the exhaustion of administrative remedies. *See* Aaron J. Lockwood, Note, *The Primary*

---

**13.** Although Time Warner filed a cross-appeal with the ICA challenging the validity of the jury's verdict, Time Warner did not appeal the ICA's decision to this court, since as noted *supra*, the ICA held that the jury's verdict must be vacated. *See Pacific Lightnet*, 2013 WL 310149, at *10.

*Jurisdiction Doctrine: Competing Standards of Appellate Review*, 64 Wash. & Lee L.Rev. 707, 739 (2007) (hereinafter Lockwood, *Competing Standards of Appellate Review*); *see also Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848, 851 (1988) ("The doctrine of primary jurisdiction represents a version of the administrative exhaustion requirement ...."). As this court noted in *Kona Old*, " '[b]oth are essentially doctrines of comity between courts and agencies.' " 69 Haw. at 93, 734 P.2d at 168 (quoting B. Schwartz, *Administrative Law* § 8.23, at 485 (2d ed. 1984)). However, it is important to note that unlike the doctrine of exhaustion, the doctrine of primary jurisdiction does not require a determination that the court lacks jurisdiction over the matter. *Compare Hawai'i Blind Vendors Ass'n v. Dep't of Human Servs.*, 71 Haw. 367, 371, 791 P.2d 1261, 1264 (1990) (concluding that the agency was the appropriate forum for an initial decision in Rudolph–Sheppard Vending Stand Act claims under the doctrine of primary jurisdiction) *with Tamashiro v. Dep't of Human Servs.*, 112 Hawai'i 388, 411–12, 146 P.3d 103, 126–27 (2006) (overruling *Hawai'i Blind Vendors* to the extent that it held that the circuit court had any original subject matter jurisdiction over Rudolph–Sheppard Vending Stand Act claims); *see also, Tamashiro*, 112 Hawai'i at 429–30, 146 P.3d at 143–45 (Pollack, J., dissenting) ("This court's conclusion that the circuit court had concurrent jurisdiction to decide the issues raised in *Hawai'i Blind Vendors* was unequivocally a determination of subject matter jurisdiction over the case.").

■ Instead, primary jurisdiction presumes that the claim at issue is originally cognizable by both the court and the agency. *Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Hawai'i 192, 202, 891 P.2d 279, 289 (1995). In contrast, applying the doctrine of exhaustion requires that the claim be only cognizable before the agency. *Kona Old*, 69 Haw. at 93, 734 P.2d at 169; *See* Lockwood, *Competing Standards of Appellate Review, supra*, at 742. Thus, the court must first determine whether the agency has exclusive original jurisdiction, in which case, the doctrine of exhaustion would apply. If not, and the court finds that it does possess jurisdiction over the matter, the court can then decide if it is appropriate to apply the doctrine of primary jurisdiction. *See* Lockwood, *Competing Standards of Appellate Review, supra*, at 750–51.

■ The impetus behind the primary jurisdiction doctrine is two-fold. First, as noted, it is designed to address cases " 'raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion[.]' " *Kona Old*, 69 Haw. at 93, 734 P.2d at 169 (quoting *Far East Conference v. U.S.*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952)). In *Far East Conference*, for example, the United States Supreme Court was deciding "whether, in a suit brought by the United States to enjoin a dual-rate system enforced in concert by steamship carriers engaged in foreign trade, a District Court can pass on the merits of the complaint before the Federal Maritime Board has passed upon the question." 342 U.S. at 573, 72 S.Ct. 492.

The District Court in *Far East Conference* had invoked the primary jurisdiction doctrine, reasoning that "[w]hether a given agreement among carriers should be held to contravene the act may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect to the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body ...." The Court upheld the District Court's use of the doctrine. *Id.* at 573–74, 72 S.Ct. 492.

■ Second, "[t]he primary jurisdiction doctrine is designed to promote uniformity and consistency in the regulatory process." *Aged Hawaiians*, 78 Hawai'i at 202, 891 P.2d at 289 (citing *Western Pac. R.R.*, 352 U.S. at 63–64, 77 S.Ct. 161). The goal of ensuring regulatory uniformity and consistency though the primary jurisdiction doctrine is evinced by the fact that the doctrine arose in the context of interstate transportation carrier rates, *see Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), and has been ap-

plied in Hawai'i cases in a number of other contexts where disparate decisions on a particular issue could undermine an administrative agency's authority and a uniform regulatory scheme. *See Chun,* 73 Haw. at 11, 828 P.2d at 260 (primary jurisdiction doctrine invoked with respect to implementation of statutory scheme governing employee retirement benefits); *Hawai'i Blind Vendors,* 71 Haw. at 370, 791 P.2d at 1264 (application of the Department of Human Services' primary jurisdiction to decide the circumstances under which the Department of Transportation could give priority treatment to a non-profit that employed handicapped individuals); *Jou v. Nat'l Ins. Co.,* 114 Hawai'i at 128, 157 P.3d at 567 (applying the primary jurisdiction doctrine to a claim that an insurance carrier had acted in bad faith). Thus, in deciding whether the primary jurisdiction doctrine applies, a judge should consider whether various courts addressing the same regulatory issue would reach different results and if those disparities would impact an overall regulatory scheme.

B. Filed–Rate Doctrine

■ The filed-rate doctrine is also known as the filed-tariff doctrine. *Balthazar,* 109 Hawai'i at 72, 123 P.3d at 198. Essentially, "it prohibits a regulated entity from charging rates for its services that differ from the rates filed with the appropriate federal regulatory agency." *Id.* (citing *Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)). In *Balthazar,* this court provided a brief history of the doctrine, noting that the twin aims of the filed-rate doctrine were to "(1) prevent[ ] service or rate discrimination among consumers and (2) prevent[ ] courts from intruding upon the rate-making authority of federal agencies." *Id.* at 73, 123 P.3d at 198 (citing *Bryan v. BellSouth Communications, Inc.,* 377 F.3d 424, 429 (4th Cir.2004)). Although originally a federal doctrine, this court has held that the principles of the filed-rate doctrine apply where rates are filed with a state regulatory agency. *Id.* (citing *Molokoa Village Dev. Co. v. Kauai Elec. Co.,* 60 Haw. 582, 587, 593 P.2d 375, 379 (1979) (stating that the rule that prevents carriers from being bound un-

der equitable doctrines to their undercharges "applies equally to other utilities")).

■ In the telecommunications sector, regulated entities have their rates and terms defined in tariffs filed with the state PUC and the FCC. *See Balthazar,* 109 Hawai'i at 74, 123 P.3d at 199. "Generally, tariffs are 'public documents setting forth services being offered; rates and charges with respect to services; and governing rules, regulations, and practices relating to those services.'" *In re Waikoloa Sanitary Sewer Co.,* 109 Hawai'i 263, 271, 125 P.3d 484, 492 (2005) (brackets omitted) (quoting *Adams v. Northern Illinois Gas Co.,* 211 Ill.2d 32, 284 Ill.Dec. 302, 809 N.E.2d 1248, 1263 (2004)).

■ Pursuant to the filed-rate doctrine, "filed tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside." *Id.* (emphasis added) (quoting *Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211, 217 (2002)). *Balthazar* noted that "neither the tort of the carrier nor the existence of a contract will work to vary or enlarge the rights defined in a tariff." 109 Hawai'i at 73, 123 P.3d at 198 (citation omitted).

■ It is well-established that " 'the filed-rate doctrine ... does not preclude courts from interpreting the provisions of a tariff and enforcing that tariff,' *Brown* [*v. MCI WorldCom Network Services, Inc.*], 277 F.3d [1166,] 1171–72 [ (9th Cir.2002) ], and that 'if the filed-rate doctrine were to bar a court from interpreting and enforcing the provisions of a tariff, that doctrine would render meaningless the provisions of the [Federal Communications Act] allowing plaintiffs redress in federal court,' *id.* at 1172." *Waikoloa,* 109 Hawai'i at 272, 125 P.3d at 493 (original brackets omitted).

■ The filed-rate or filed-tariff doctrine does preclude certain types of claims, however. This court has held that claims that "directly attack the validity or reasonableness of rates or terms defined in a tariff" are barred, *see Balthazar,* 109 Hawai'i at 74, 81, 123 P.3d at 199, 206, and claims that seek damages are barred "if an award of damages 'would have the effect of imposing any rate other than that reflected in the filed tar-

---

iff[,]' " *id.* at 81, 123 P.3d at 206 (quoting *Dreamscape Design, Inc. v. Affinity Network, Inc.,* 414 F.3d 665, 669 (7th Cir.2005)). Despite these limitations, it appears that so long as a claim only "ask[s] the courts to interpret the filed rates, or to enforce the filed rates" the claim will not be barred by the filed-rate doctrine. *Id.* (citations and internal quotation marks omitted).

This court has applied the filed-rate doctrine in three prior cases, *Molokoa Village, Balthazar,* and *Waikoloa,* which are briefly summarized as follows for illustrative purposes. In *Molokoa Village,* the plaintiff alleged that the defendant, the electric utility serving Kauai, was required to reimburse to the plaintiff the costs of installation of an underground electric system in a real estate development, as agreed upon by the parties. 60 Haw. at 583, 593 P.2d at 377. The defendant alleged that although the parties had agreed, it was unable to lawfully reimburse the full agreed-upon costs because of the limitations provided in its tariff. *Id.* at 584, 593 P.2d at 377.

According to the terms of the tariff, the tariff barred payment of the agreed-upon claim, unless the additional expense of the underground installation was for "engineering and operating reasons." *Id.* at 588, 593 P.2d at 380. This court construed the defendant's position as asserting the defense of "illegality," and therefore concluded that the defendant carried the burden of proof to show that the reimbursement would violate the tariff limitation. *Id.* In addressing the merits, *Molokoa Village* held that "[t]he facts found by the trial court suggest that the [plaintiff] may have had engineering and operating reasons for some portion of [the] underground installation and thus do not negate the existence of such reasons for assuming the entire cost of the system." *Id.* at 589, 593 P.2d at 380. Since the defendant did not affirmatively establish that there were no engineering and operating reasons for the additional cost, this court held that a reimbursement of the agreed-upon amount was required. *Id.* Thus, in *Molokoa Village,* the filed-rate doctrine was analyzed as a defense to a contract claim.

In *Balthazar,* Verizon had represented to consumers that they must pay a fee in order to receive "Touch Calling" services. 109 Hawai'i at 71, 123 P.3d at 196. However, identical telephone services were provided to customers who did not pay the fee. *Id.* at 70, 123 P.3d at 195. The plaintiffs filed a complaint against Verizon, claiming that Verizon had engaged in false, unfair, and/or deceptive trade practices by misrepresenting to consumers that they had to pay an additional fee. *Id.* at 71, 123 P.3d at 195. The relevant tariff provisions provided that a charge was to be paid for the Touch Calling service, because the PUC had ordered that the existing rate structure be kept intact despite changes in the relevant technology, to enable the recovery of costs for other services. *Id.*

Verizon filed a motion to dismiss the complaint, arguing that plaintiff's complaint was barred by both the filed-rate and primary jurisdiction doctrines. *Id.* The trial court denied Verizon's motion to dismiss, but later granted a motion for summary judgment filed by Verizon on the ground that the claims were barred by the filed-rate doctrine. *Id.* at 70, 123 P.3d at 195. This court held that the claims were barred because (1) knowledge of the tariff terms, including the fees for Touch tone calling services was imputed to consumers under the filed-rate doctrine, *id.* at 75, 123 P.3d at 200, (2) despite the alleged misrepresentations, the plaintiffs incurred no injury because they had paid the filed rate for the Touch Calling service under the terms of the tariff, *id.* at 80, 123 P.3d at 205, and (3) payment to the plaintiffs to reimburse the Touch Calling fee by Verizon or by the court in the form of damages would have the effect of imposing a lower rate for Touch Calling fees than the rate prescribed by the tariff, in violation of the filed-rate doctrine, *id.* at 80–81, 123 P.3d at 205–06. Thus, in *Balthazar,* this court interpreted and enforced the terms of the tariff in reaching its result.

In *Waikoloa,* this court considered, *inter alia,* whether contributions made by real estate developers to a public utility to build new wastewater collection and treatment facilities fell within the purview of a filed tariff. 109 Hawai'i at 270, 125 P.3d at 491. The

appellant had appealed from a final order of the PUC requiring that it refund certain contributions. *Id.* This court concluded that the PUC had erred in requiring that the appellant provide a refund to the developers, because the appellant's filed tariff stated that "[developers] shall be required to pay a non-refundable contribution in aid of construction of the Company." *Id.* at 272, 125 P.3d at 493 (emphasis in original). *Waikoloa* interpreted the tariff under the principles of statutory interpretation, and held that because the tariff language explicitly prohibited refunds, the payments were not refundable, regardless of whether the limitations on refunds furthered the public policy behind the filed-rate doctrine. *Id.* at 272 n. 10, 273, 125 P.3d at 493 n. 10, 494.

## VI. Subject Matter Jurisdiction

### A.

As noted, in this case, the court dismissed the Feature Group D claims in an order titled "Order Granting [Time Warner]'s Motion to Dismiss for Lack of Subject Matter Jurisdiction Based on the Primary Jurisdiction of the Public Utilities Commission Filed September 5, 2007."[14] However, it must be noted that the doctrine of primary jurisdiction is distinct from subject matter jurisdiction for analytical purposes. As explained above, under the doctrine of primary jurisdiction, the court and the agency share concurrent jurisdiction over the matter. *See, e.g., Chun,* 73 Haw. at 12, 828 P.2d at 262; *Hawai'i Blind Vendors,* 71 Haw. at 371, 791 P.2d at 1264; *Kona Old,* 69 Haw. at 93, 734 P.2d at 169. *See also, Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("Referral of the issue to the administrative agency does not deprive the court of jurisdiction[.]").

Although this court, in *Chun,* seems to suggest that primary jurisdiction is part of subject matter jurisdiction, the language of *Chun'*s holding is that "[t]he stay of proceed-

ings pending administrative review <u>involves a jurisdictional issue</u> which can never be waived by any party at any time." 73 Haw. at 14, 828 P.2d at 263 (citation omitted). Thus, primary jurisdiction is "a jurisdictional issue," *id.,* although it does not directly implicate a court's subject matter jurisdiction. *See also, Tamashiro,* 112 Hawai'i at 430, 146 P.3d at 145 (Pollack, J., dissenting) (noting that a court's conclusion that it had concurrent jurisdiction with an agency over particular matter means that the court has already decided that it possesses subject matter jurisdiction).

This distinction is reflected in the discretion given to courts to decide whether to dismiss <u>or stay</u> litigation after a finding that the primary jurisdiction doctrine applies, as discussed *infra. Fratinardo,* 121 Hawai'i at 469, 220 P.3d at 1050. If primary jurisdiction was equivalent to subject matter jurisdiction, then dismissal would be the only option available to courts. *See Riethbrock v. Lange,* 128 Hawai'i 1, 11, 282 P.3d 543, 553 (2012) ("A judgment rendered by a circuit court without subject matter jurisdiction is void.") (citation omitted).

### B.

First, it must be determined whether the court had subject matter jurisdiction over the Feature Group D claims. The ICA noted that there is no dispute over whether the Feature Group D claims were "originally cognizable" in the court, and analyzed the case only with respect to whether the court had primary jurisdiction over the matter. *Pacific Lightnet, Inc.,* 2013 WL 310149, at *6, n. 6. However, this court must address subject matter jurisdiction to first determine whether the claims were cognizable in circuit court.

"The existence of jurisdiction is a question of law that [this court] review[s] *de novo* under the right/wrong standard." *Aman-*

---

14. Neither party argues that the court lacked subject matter jurisdiction, and the ICA apparently assumed that the court did have subject matter jurisdiction. However, it is noted that "[i]f the parties do not raise the issue [of lack of jurisdiction over the subject matter], a court *sua sponte* will, for unless jurisdiction of the court

over the subject matter exists, any judgment rendered is invalid." *Tamashiro,* 112 Hawai'i at 398, 146 P.3d at 113 (citation omitted). In this case, there was no statute that would deprive the court of jurisdiction over the Feature Group D claims. Therefore, the court had subject matter jurisdiction in the instant case.

*tiad v. Odum,* 90 Hawai'i 152, 158, 977 P.2d 160, 166 (1999) (quoting *Lester v. Rapp,* 85 Hawai'i 2358 [238], 241, 942 P.2d 502, 505 (1977) [ (1997) ]). "[I]f a court lacks jurisdiction over the subject matter of a proceeding, any judgment rendered in that proceeding is invalid[, t]herefore, such a question is valid at any state of the case[.]" *Bush v. Hawaiian Homes Comm'n,* 76 Hawai'i 128, 133, 879 [870] P.2d 1272, 1277 (1994) (brackets and internal quotation marks omitted).

*Kepo'o v. Kane,* 106 Hawai'i 270, 281, 103 P.3d 939, 950 (2005) (brackets in original).

Time Warner does not argue that PLNI's claims should have been dismissed because the PUC had exclusive jurisdiction over the Feature Group D claims. However, in support of its argument that the court properly exercised the doctrine of primary jurisdiction, Time Warner cites to a number of statutory provisions that it claims indicate the legislature's intent to set up a comprehensive regulatory scheme, "which specifically gives the PUC primary jurisdiction over transmission and billing disputes between carriers." Although Time Warner characterizes these as indicating "primary jurisdiction," as a preliminary matter, it must be determined whether these statutes would give the PUC exclusive jurisdiction over the Feature Group D claims.[15]

HRS § 269-6(a) (Supp.2000) provides that "[t]he public utilities commission shall have the general supervision hereinafter set forth over all public utilities, and shall perform the duties and exercise the powers imposed or conferred upon it by this chapter." In addition, with respect to the PUC's investigative powers, HRS § 269-7(a) (1993) provides that:

> (a) The public utilities commission and each commissioner shall have power to examine into the condition of each public utility ... the fares and rates charged by it ... the amount and disposition of its income, and all its financial transactions, its business relations with other persons, companies, or corporations, its compliance with all applicable state and federal laws and with the provisions of its franchise, charter, and articles of association, if any, its classifications, rules, regulations, practices, and service, and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations.

(Emphases added.)

The Feature Group D claims in the instant case would fall within the broad provisions of HRS § 269-6 and HRS § 269-7, as a dispute between telecommunication carriers regarding billing and compensation for services.[16] However, this would not deprive the court of jurisdiction over such matters. The language of the above provisions indicates only that the PUC would have jurisdiction over matters such as transactions between carriers, and not that the PUC would have exclusive jurisdiction. While such provisions authorize the PUC to undertake certain ac-

---

15. Several other jurisdictions have statutes that unequivocally grant original, exclusive jurisdiction in their state utilities commission for certain types of claims. For example, in *Kazmaier Supermarket v. Toledo Edison Co.,* 61 Ohio St.3d 147, 573 N.E.2d 655 (1991), the Ohio supreme court reviewed a number of provisions in its revised code, and concluded that "[t]he [legislature] has provided a specific remedy for persons, firms or corporations who have sustained damages due to an unlawful act of a public utility, or where such damages arise from the utility's omission to do any act or thing required by law or by the order of the commission." *Id.* at 659. Similarly, in *Village of Evergreen Park v. Commonwealth Edison Co.,* 296 Ill.App.3d 810, 231 Ill.Dec. 220, 695 N.E.2d 1339 (1998), an Illinois appellate court reviewed the Illinois Commerce Commission's jurisdiction, noting that "[i]n accordance with [the Public Utility] Act,. the [Commerce] Commission has exclusive jurisdiction over complaints of excessive rates or overcharges by public utilities; and courts have jurisdiction over those matters only on administrative review." *Id.,* 231 Ill.Dec. 220, 695 N.E.2d at 1341. The instant case is distinguishable from *Kazmaier* and *Village of Evergreen Park* in that, as discussed *infra,* Hawai'i law related to the PUC does not divest subject matter jurisdiction from the courts. *See, e.g., Balthazar,* 109 Hawai'i at 81, 123 P.3d at 206; *Waikoloa,* 109 Hawai'i at 273, 125 P.3d at 494.

16. In support of its assertions that the PUC has original jurisdiction over these matters, Time Warner also cites to HRS § 269-37 (Supp.1995). However, HRS § 269-37 relates to the negotiation of compensation agreements between carriers, which does not appear to be implicated in this case. *See* HRS § 269-37.

274

tivities, including investigation, they do not prohibit the court from deciding cases involving matters such as the relationship between a public utility and other companies or corporations. *See* HRS § 269–7(a).

Moreover, HRS § 269–15(a) (1993) states that "[t]he commission may examine into any of the matters referred to in <u>section 269–7</u> [17] , <u>notwithstanding that the same [matters referred to in HRS § 269–7] may be within the jurisdiction of any court or other body; provided that [HRS § 269–15] shall not be construed as in any manner limiting or otherwise affecting the jurisdiction of any such court or other body</u>." (Emphases added.) Hence, the statute recognizes that the matters described in 269–7 may be within the jurisdiction of the court, indicating that PUC jurisdiction is not exclusive. HRS § 269–15(a) expressly preserves the jurisdiction "of any such court" as concurrent with the authority granted to the PUC.

In HRS § 269–15(a), the legislature recognized <u>concurrent jurisdiction</u> could exist in the courts, when it stated that "[HRS § 269–15] shall not be construed as in any manner limiting or otherwise affecting the jurisdiction of any such court...." As stated previously, courts have exerted subject matter jurisdiction over PUC matters. *See Balthazar*, 109 Hawai‘i at 71, 123 P.3d at 195; *Molokoa Village*, 60 Haw. at 588, 593 P.2d at 380.

Accordingly, under Hawai‘i's statutory scheme, certain powers are granted to the PUC, but those statutorily enumerated powers do not deprive the circuit courts of jurisdiction in areas where jurisdiction might overlap. Rather, claims brought in the courts may be subject to the primary jurisdiction doctrine and the filed-rate doctrine, which serve to limit the ability of a plaintiff to bring claims in the courts rather than with the PUC, as discussed *supra*. Consequently, these doctrines do not erect barriers to original jurisdiction.[18]

Thus, in Hawai‘i, the courts have subject matter jurisdiction over disputes between carriers regarding billing and compensation for services. The court in this case, then, had concurrent jurisdiction with the PUC over PLNI's Feature Group D claims.

## VII. Standard of Review for Primary Jurisdiction

Having determined that the court had concurrent jurisdiction with the PUC, the inquiry is whether the court properly dismissed Petitioner's Feature Group D claims as a matter of primary jurisdiction. Related to the distinction between primary jurisdiction and subject matter jurisdiction is the question of what standard of review this court should apply in determining whether the court properly dismissed PLNI's claims. Hawai‘i case law in the area of primary jurisdiction has not directly addressed the applicable standard of review. Federal courts of appeal are split as to whether to apply a de novo or abuse of discretion standard, *see S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 750 (10th Cir.2005); A. Lucchetti, Note, *One Hundred Years of the Doctrine of Primary Jurisdiction: But What Standard of Review is Appropriate For It ?*, 59 Admin. L.Rev. 849, 851 (2007); Lockwood, *Competing Standards of Appellate Review*, *supra*, at 721–22, although it appears that most states apply de novo review, *see e.g.*, *Siewert v. N. States Power Co.*, 793 N.W.2d 272, 277 (Minn.2011); *The Country Vintner, Inc. v. Louis Latour, Inc.*, 272 Va. 402, 634 S.E.2d 745, 750 (2006); *In re Interest of*

**17.** The remainder of HRS § 269–7 provides that:
(b) The commission may investigate any person acting in the capacity of or engaging in the business of a public utility within the State, without having a certificate of public convenience and necessity or other authority previously obtained under and in compliance with this chapter or the rules promulgated under this chapter.
(c) Any investigation may be made by the commission on its own motion, and shall be made when requested by the public utility to be investigated, or by any person upon a sworn written complaint to the commission, setting forth any prima facie cause of complaint. A majority of the commission shall constitute a quorum.

**18.** The statutory scheme governing the PUC in Hawai‘i is not a "complete and comprehensive statutory scheme governing review" by the PUC, *Kazmaier*, 573 N.E.2d at 659, and thus the instant case is distinguishable from *Kazmaier* and *Village of Evergreen Park*.

*Battiato*, 259 Neb. 829, 613 N.W.2d 12, 15 (2000).

The elements of the primary jurisdiction doctrine that are generally considered to be matters of law have been discussed, including whether the issues presented are not within the conventional experience of judges, *see Kona Old*, 69 Haw. at 93, 734 P.2d at 169, and whether deferring to an agency will promote uniformity and consistency in the regulatory process, *see Aged Hawaiians*, 78 Hawai'i at 202, 891 P.2d at 289. However, courts that have held that an abuse of discretion standard applies emphasize the prudential nature of the doctrine, namely that "[the court] has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Reiter*, 507 U.S. at 268–69, 113 S.Ct. 1213. *See also* Lockwood, *Competing Standards of Appellate Review*, *supra*, at 739 (arguing that direct contact with the litigant makes the trial judge better able to weigh the burdens of referral, and that this should be a "heavy consideration" weighing in favor of de novo review). As discussed *infra*, and consistent with the prudential aspects of the doctrine, the court may take into consideration when in the litigation process the issue of primary jurisdiction was first raised, and the extent to which applying the doctrine could be prejudicial to either party. *See U.S. v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984) ("A court should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to litigants where the nature of the action deems the application of the doctrine inappropriate.") (internal quotation marks and citation omitted).

 The focus of the trial court's decision, however, should be on the rationales underlying the doctrine, which are matters of law. As such, issues of primary jurisdiction should be reviewed de novo on appeal. Such a holding is consistent with this court's characterization of primary jurisdiction as "a jurisdictional issue." *Chun*, 73 Haw. at 14, 828 P.2d at 263. Inasmuch as "[t]he existence of jurisdiction is a question of law that we review de novo under the right/wrong standard[,]" *Lingle v. Hawai'i Gov't Emp. Ass'n, AFSCME, Local 152*, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005), the court's decision to invoke the primary jurisdiction doctrine is reviewed de novo as well. If the court determines that the primary jurisdiction doctrine applies, the court, in its discretion, may determine whether to stay the litigation or dismiss without prejudice.[19]

### VIII. Application of the Primary Jurisdiction Doctrine

 The court's decision to invoke primary jurisdiction is reviewed on the basis of the dual rationales underlying the primary jurisdiction doctrine, as discussed above. Applying these two rationales to the instant case, it appears that the court erred in applying the doctrine of primary jurisdiction.

### A.

 The first rationale relates to the specialized competence of the administrative agency. *See Kona Old*, 69 Haw. at 93, 734 P.2d at 168. In its analysis regarding the primary jurisdiction doctrine, the ICA emphasized the regulatory scheme set forth in HRS Chapter 269, *Pacific Lightnet, Inc.*, 2013 WL 310149, at *7, and PLNI argues in its Application that there is no specific statutory mandate that directs that PUC must

19. On appeal from the ICA's decision, PLNI does not challenge the fact that the court dismissed all of the Feature Group D claims, rather than staying the enforcement of the jury verdict pending the resolution by the PUC. Thus, this issue need not be decided herein. However, as to this issue, the ICA concluded in *Fratinardo*, 121 Hawai'i at 468–69, 220 P.3d at 1049–50, that the court has discretion to fashion an appropriate remedy when applying the primary jurisdiction doctrine. This rationale is sound, as evidenced in the instant case, where the court dismissed PLNI's claims rather than require the parties to wait for the outcome of the PUC's decision before filing an appeal. However, a court can abuse its discretion in fashioning a remedy after invoking the primary jurisdiction doctrine if such a remedy would unduly prejudice one or both of the parties. *See, e.g., Brown*, 277 F.3d at 1172–73 (noting that where a two-year statute of limitations for the plaintiff's action had expired, the plaintiff may be "unfairly disadvantaged" if the district court were to dismiss the claim without prejudice under the primary jurisdiction doctrine).

handle billing disputes. It is important to distinguish, however, between a statutory scheme that evinces the Legislature's intent to divest the court of jurisdiction, and a statutory or regulatory scheme that places certain issues "within the special competence of an administrative body." *Kona Old*, 69 Haw. at 93, 734 P.2d at 168 (emphasis added) (internal quotation marks and citation omitted). The question, as noted, is whether the issue is "within the conventional experience of judges." *Far East Conference*, 342 U.S. at 574, 72 S.Ct. 492. Thus, while the existence of statutes and regulations discussing the PUC's authority over particular matters is certainly relevant to the court's determination of whether to apply primary jurisdiction, it is not dispositive. Equally important is the question of whether the claim presented "falls squarely within the experience and expertise of courts generally[,]" *Advamtel, LLC v. AT & T Corp.*, 105 F.Supp.2d 507, 512 (E.D.Va.2000), or if, instead, the claims are premised on "technical matters calling for the special competence of the administrative expert[,]" *Aged Hawaiians*, 78 Hawai'i at 202, 891 P.2d at 289.

Contrary to the ICA's holding, the statutes and rules cited by Time Warner do not require dismissal on the basis of primary jurisdiction. Time Warner cites to HRS § 269–6 (providing PUC with general supervision over all public utilities), HRS § 269–16 (Supp.1998) (providing PUC with general supervision over all public utility rates charged), and HRS § 269–37 (providing PUC with authority to determine compensation agreements between carriers). These statutes do not place the action in the instant case within the "special competence" of the PUC, however. They provide the PUC with authority to take certain actions as an administrative agency, but, the authority granted to the PUC over certain types of billing disputes is shared with the courts.

The "special competence" of the PUC under the primary jurisdiction doctrine involves the types of actions that are related to the rationales behind the doctrine, to promote uniformity and to prevent courts from engaging in the types of policy-making decisions that administrative agencies must make. Thus, the PUC's special competence is in, for example, regulation of utility rates and ratemaking procedures, *see* HRS § 269–16, and in ensuring that compensation agreements between telecommunications carriers are fair, *see* HRS § 269–37, actions that promote uniformity across the industry and fair rates for customers. None of these statutes indicate that the PUC should have primary jurisdiction over a billing dispute, where that dispute does not have broader implications with respect to rates or relationships among carriers generally.

Moreover, the regulations cited by Time Warner do not require dismissal in order that the PUC to exercise primary jurisdiction. HAR § 6–61–71 provides only that "[t]he commission may at any time investigate matters subject to its jurisdiction." HAR § 6–80–7(a) simply states that "[t]o the extent feasible and practical, disputed issues of access, interconnection, unbundling, and network termination shall be combined into a single petition before the commission." These provisions seem to set forth only the PUC's internal procedures for exercising its jurisdiction, rather than any specialized competence in the area of billing disputes. Additionally, Time Warner avers that HAR Chapter 6–80 provides a comprehensive treatment of billing disputes, specifically HAR § 6–80–102, which, to reiterate, states:

(a) When a dispute arises between a customer and a telecommunications carrier regarding any bill, the carrier may require the customer to pay the undisputed portion of the bill. The carrier shall conduct an appropriate investigation of the disputed charge or charges and shall provide a report of the investigation to the customer. Where the dispute is not reconciled, the carrier shall advise the customer that the customer has the right to file a complaint with the commission regarding the dispute.

However, regardless of whether HAR § 6–80–102 would in fact apply in a situation such as the instant case, it does not evince a comprehensive regulatory scheme that would create a "special competence" in the PUC to resolve billing disputes between two carriers. Thus, Time Warner's reference to statutory and regulatory requirements are not persua-

sive with respect to establishing the special competence of the PUC.

■ Also, Time Warner alleges that the Feature Group D claims require the specialized and technical expertise of the PUC. Although Time Warner maintains that the claims required a review of call detail records, which "show who is making the call, who is receiving the call, and what carriers are associated with the calls," as well as an understanding of carrier identification codes, Time Warner has not indicated <u>why</u> a jury would not be able to understand these matters, if properly explained, other than to say that they are "technical" in nature.[20] In its briefing, Time Warner claims that the jury <u>was not</u> instructed properly on the technical matters involved in the case, but again, this argument goes to the validity of the jury verdict itself, rather than to whether the court properly dismissed the claim pursuant to primary jurisdiction.

Time Warner avers that *MCI Telecommunications Corp. v. Ameri–Tel, Inc.*, 852 F.Supp. 659 (1994), supports its position, in that the court in that case stated:

> The Court also concludes that there is no need for us to delve deep into the world of information indicators, automatic number identifiers, operator line screening, billed number screening, and all the other acronyms Ameri–Tel believes are at the heart of this case. The FCC is better suited than this Court to decide issues turning on the operation of these technical mechanisms. However, as we stated above, Ameri–Tel has overstated the nature of this case.

852 F.Supp. at 665. Here, however, it appears that Time Warner has similarly "overstated the [technical] nature of this case." *Id.* The *MCI* court goes on to state that, "[t]his case is not about technical or economic issues in the telecommunications industry, .... [i]t is likewise not about the reasonableness of the MCI Tariff. Rather, it is a collection case requiring application of the

filed-rate doctrine and construction of the terms of the MCI Tariff." *Id.* at 666.

Analogously, the instant case is not about technical or economic issues in the telecommunications industry. The questions posed by this case do appear to involve some industry terminology and processes. However, juries frequently hear cases involving technical terms and processes. The presence of industry terminology and technical processes in a particular suit are not enough to require that the court invoke the primary jurisdiction. Thus, there is no indication that these claims are premised on "technical matters calling for the special competence of the administrative expert." *Aged Hawaiians*, 78 Hawai'i at 202, 891 P.2d at 289.

Instead, the claims at issue in this case appear to be "within the conventional experience of judges." *Far East Conference*, 342 U.S. at 574, 72 S.Ct. 492. In *Advamtel*, the Eastern District of Virginia court considered a claim by local exchange carriers to recover unpaid fees allegedly owed to them by long distance carriers. 105 F.Supp.2d at 509. AT & T filed a counterclaim alleging, *inter alia*, that the plaintiff had billed AT & T for access services which AT & T never ordered, contrary to the terms of their filed tariffs. *Id.* at 512. That court held that two of the counterclaims in the case, requiring an evaluation of the reasonableness of the rates under the applicable tariff, should be referred to the FCC. *Id.* With respect to the remainder of the counterclaims, the court noted that the threshold legal question underlying those claims was "whether plaintiffs had a right to bill [defendant] for the access services at issue ...."

That court reasoned that "AT & T's counterclaims are premised on the assertion that, under plaintiffs' filed tariffs, which establish a procedure for ordering plaintiffs' access services, it did not order such services[,]" and that, accordingly, "[i]f AT & T never ordered plaintiffs' access services, AT & T cannot be

---

**20.** While Time Warner claims that Hawai'i has recognized that "transmission and billing matters between telecommunications carriers typically require technical expertise that is within the exclusive jurisdiction of the PUC[,]" the cases cited by PLNI indicate that *rate-making* is within

the exclusive jurisdiction of the PUC. *See In re Hawaiian Telephone Co.*, 67 Haw. 370, 379, 689 P.2d 741, 747 (1984); *In re Hawai'i Electric Light Co.*, 60 Haw. 625, 636, 594 P.2d 612, 620 (1979).

forced to pay plaintiffs for those services."
*Id.*

Under these facts, *Advamtel* characterized AT & T's counterclaim as an "entitlement to bill issue" and stated that it is "essentially similar to a typical contract dispute involving issues of contract formation through offer and acceptance." *Id.* Therefore, it held the enforcement of the tariff was "within the ordinary experience and expertise of courts." *Id.* at 513. This is akin to the facts of the instant case, wherein PLNI claimed that it was charged for services that it never received, essentially, an "entitlement to bill issue." Thus, the issues raised in this case are similarly within the ordinary expertise of courts.

### B.

■ The second question is whether applying the primary jurisdiction doctrine will "promote uniformity and consistency in the regulatory process." *Aged Hawaiians,* 78 Hawai'i at 202, 891 P.2d at 289. *See also, Advamtel,* 105 F.Supp.2d at 511 ("One issue typically referred to the FCC under the primary jurisdiction doctrine is the reasonableness of a carrier's tariff because that question requires the technical and policy expertise of the agency, and because it is important to have a uniform national standard concerning the reasonableness of a carrier's tariff, as a tariff can affect the entire telecommunications industry"); *MCI,* 852 F.Supp. at 666 (noting that, in a collection case requiring application of the filed-rate doctrine, "there is no danger of . . . contradicting a prior application to the FCC in this case . . . or issuing a ruling inconsistent with the FCC's overall regulatory scheme."). Here, there is no indication that applying the primary jurisdiction doctrine would promote the uniformity and consistency rationales behind the doctrine. The instant case does not require the exercise of administrative discretion, and furthermore,

a result in this case would not impact the result in any other cases, inasmuch as the facts and circumstances are unique to these parties and their asset purchase agreements with GST. A decision with respect to the obligations of the parties here would not affect future customers or other telecommunications carriers.

### C.

■ In addition to the two rationales underlying the primary jurisdiction, the doctrine also has a prudential aspect, as noted, that courts should take into consideration in deciding whether it is appropriate to stay or dismiss the proceedings and defer to the agency. For example, in *Jou,* this court stated that "[s]taying the proceedings conserves scarce judicial resources by allowing an administrative agency with expertise to decide the predicate issues." 114 Hawai'i at 128, 157 P.3d at 567. On the other hand, the United States Supreme Court has noted that "[w]ise use of the doctrine necessitates a careful balance of the benefits to be derived from utilization of agency processes as against the costs in complication and delay." *Ricci v. Chicago Mercantile Exch.,* 409 U.S. 289, 321, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). *See also McDonnell Douglas Corp.,* 751 F.2d at 224 ("[A] court 'should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate.'") (emphasis added) (quoting *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 419 (5th Cir.1976), *cert. denied.,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977)).

In connection with these prudential concerns, PLNI argued that the court should not cede jurisdiction where primary jurisdiction is raised only after a jury trial has resolved the factual issues.[21] In support of

---

21. PLNI also correctly points out that none of this jurisdiction's cases applying the primary jurisdiction doctrine have deferred the matter to the agency after a verdict had already been entered in a jury trial. *See Chun,* 73 Haw. at 10, 828 P.2d at 261 (trial court granted summary judgment); *Hawai'i Blind Vendors,* 71 Haw. at

368, 791 P.2d at 1263 (trial court granted summary judgment); *Aged Hawaiians,* 78 Hawai'i at 199–200, 891 P.2d at 286–87 (circuit court granted in part a motion to dismiss on the basis that alternative administrative procedures were available); *Kona Old,* 69 Haw. at 86, 734 P.2d at 164 (circuit court dismissed appeal from planning

this argument, PLNI cited to *Travelers Insurance Co. v. Detroit Edison Co.*, 465 Mich. 185, 631 N.W.2d 733 (2001), in which the Michigan Supreme Court noted that "[t]here may well be cases, for example, in which the invocation of primary jurisdiction is not appropriate because litigation with respect to the particular claim·that would normally be subject to the jurisdiction of the administrative agency has 'advanced to a point where it would be unfair to remit the [party] to another and duplicative proceeding....'" 631 N.W.2d at 746 n. 19 (alterations in original) (quoting *White Lake Imp. Ass'n v. City of Whitehall*, 22 Mich.App. 262, 177 N.W.2d 473, 483 (1970)).

The instant case appears to be one of those cases in which the application of the primary jurisdiction doctrine would be unfair, inasmuch as Time Warner raised the issue only on the eve of trial, and applying the doctrine would require additional proceedings that would be duplicative of the 2007 jury trial. As noted, Time Warner filed its Answer on August 30, 2007, alleging for the first time that PLNI's claims were barred by the doctrine of primary jurisdiction. On September 4th, after the parties had already submitted proposed jury instructions, witness lists, and special verdict forms, Time Warner submitted its Motion to Dismiss based on the primary jurisdiction of the PUC. This was the same day that trial began. Accordingly, the court decided not to hear the motion, but instead to go forward with the jury trial.

Under these circumstances, the timing of Time Warner's initial assertion that the primary jurisdiction doctrine should apply may be taken into consideration, inasmuch as a party could "game" the system by only raising primary jurisdiction as a late-stage alternative, in the event that the court proceedings appear to be resolving in favor of its opponent. In this case, because the issue was raised at a late date and decided only after a jury trial on the factual issues, the late timing of Time Warner's assertion is a factor among others that weighs against invocation of the doctrine. Therefore, because

the rationales underlying the primary jurisdiction doctrine would not be effectuated through its application to this case, we hold the court erred in invoking the doctrine and dismissing PLNI's claims.

### IX. Review of the Jury Verdict

█ PLNI's second point of error challenges the ICA's conclusion that the jury verdict must be vacated because it violated the filed-rate doctrine. As a preliminary matter, we must determine whether this point of error may be reached. Because the court dismissed the Feature Group D claims, through the dismissal the court appears to have invalidated the jury verdict, although it apparently did not intend to do so, since it also stayed the jury's verdict.

As noted, after a jury verdict was rendered on September 13, 2007 as to the Feature Group D claims, the court held a hearing on Time Warner's September 4, 2007 motion to dismiss based on the primary jurisdiction of the PUC. At the hearing, the court orally ruled that it would grant the motion to dismiss "on the basis of primary jurisdiction" and that "in granting the motion ... [it was] staying the effect of the verdict...." On October 23, 2007, the court entered an order granting Time Warner's motion to dismiss. On December 12, 2007, the court entered a final judgment which reflected its oral ruling at the hearing on the motion to dismiss. The final judgment stated in part, to reiterate: "By [the October 23, 2007] Order, the [c]ourt dismissed all of the Feature Group D claims on the basis of the primary jurisdiction doctrine. Due to the dismissal of the Feature Group D claims, the [c]ourt stayed enforcement of the jury verdict in favor of PLNI on the Feature Group D claims entered on September 13, 2007 until further order of the [c]ourt."

The court's dismissal of the Feature Group D claims would dismiss the jury's verdict, so there would no longer be any verdict to enforce. Therefore, the court's judgment, dismissing the Feature Group D claims pursuant to its determination that pri-

department director's decision); *Jou,* 114 Hawai'i at 126, 157 P.3d at 565 (circuit court grant-

ed motion to dismiss).

mary jurisdiction lay in the PUC, and staying the enforcement of the jury's verdict pending further order of the court, was internally inconsistent.

Ordinarily, having concluded that the court erred in applying the primary jurisdiction doctrine to dismiss the Feature Group D claims, this court would vacate the dismissal and remand the case to proceed to trial on those claims. In this case, however, the trial as to those claims has already taken place and a jury has rendered a verdict. The validity of that verdict, under the filed-rate doctrine was appealed to the ICA, and the ICA decided whether the verdict was in fact valid on the merits.[22] The parties also briefed substantive issues related to the jury's verdict before the ICA and this court. Under these circumstances, in the interest of judicial economy, this court may proceed to render a decision as to PLNI's second point of error—whether the jury's verdict should be upheld as valid.

## X. Application of the Filed–Rate Doctrine

In this case, Time Warner alleges that a variety of tariff provisions were apparently violated by the jury verdict. Inasmuch as tariffs operate like laws, Time Warner's argument on this issue is akin to an argument that the verdict is wrong as a matter of law. Time Warner contends that, contrary to the jury's verdict, the tariffs bar the Feature Group D claims.

### A.

■ Time Warner first alleges that the jury verdict is contrary to provisions in the PUC and FCC tariffs deeming that all billing disputes not submitted to Time Warner within 120 days of receipt of the bill are waived. The PUC tariff titled "Regulations and Schedule of Intrastate Charges Applying to Access Services Within the State of Hawai'i" provides as follows, at § 2.7:

**22.** As noted, the ICA held the court properly invoked the doctrine of primary jurisdiction in dismissing the Feature Group D claims. *Pacific Lightnet,* 2013 WL 310149, at *11–12. The ICA also clarified that the dismissal was without prejudice. *Id.* at *12. In light of its conclusion that dismissal was proper, it is not clear that the

### 2.7 Disputed Bills

Objections to billed charges must be reported to the Company within 120 days of receipt of billing. Any claim not filed within this time period shall be deemed waived. Claims must include all supporting documentation and may be submitted online at ... or by telephone at.... The Company shall make adjustments to the Customer's invoice to the extent that circumstances existing which reasonably indicate that such changes are appropriate.

(Emphasis added.) In the FCC tariff titled, "Regulations and Rates of Time Warner Telecom," § 2.11 similarly provides:

### 2.11 Claims and Disputes

Objections to billed charges must be reported to the Company within 120 days of receipt of billing. Any claim not filed within this time period shall be deemed waived. Claims must include all supporting documentation and may be submitted online at ... or by telephone at.... The Company shall make adjustments to the Customer's invoice to the extent that circumstances existing which reasonably indicate that such changes are appropriate.

(Emphasis added.) Pursuant to the filed-rate doctrine, notice of the terms and rates of the tariff, including these provisions, is imputed to PLNI. *Balthazar,* 109 Hawai'i at 73, 123 P.3d at 198 (citing *Evanns v. AT & T Corp.,* 229 F.3d 837, 840 (9th Cir.2000)).

### B.

■ In Time Warner's Answer to PLNI's initial complaint, Time Warner had alleged as a defense that PLNI's claims were barred by the filed-rate doctrine. As noted, the court struck the affirmative defenses listed in Time Warner's Answer because the Answer was not timely filed,[23] including the 120–day provision in the tariff, which the court construed as a statute of limitations. This was explained at trial, when Time Warner submit-

ICA's holding with respect to the validity of the jury verdict would have any effect.

**23.** To reiterate, the only affirmative defense not stricken by the court was lack of subject matter jurisdiction. *See* discussion *supra.*

ted an instruction on the 120–day time limitation in the tariffs as part of its proposed jury instructions. As to the jury instruction, the court stated:

> Okay. As to No. 16, the 120 days, the [c]ourt allowed evidence of 120 days because it's relevant in part to the defense of—or strike that—to negativing the plaintiff's evidence of undue delay inasmuch as you're supposed to file a claim within 120 days and you haven't done so and you say all the invoices, and that means everything before—well, for the duration of the relationship which exceeds 120 days, and the [c]ourt allowed that in as evidence. But the [c]ourt finds that the 120 days of the tariff is akin to or constitutes the statute of limitations, which in this case is by Hawai'i law an affirmative defense. And even though—although there hasn't been a request for an instruction about statute of limitations being six years on a contract, it wouldn't be given anyway because I struck all the affirmative defenses. And it may be that there are two statute of limitations that are potentially applicable. And I think the best analogy to that is the City and County ordinance which said you had to file a complaint within six months, which at one time the Hawai'i Supreme Court construed as the statute of limitations. I think this is similar and, therefore, constitutes an affirmative defense stricken because the answer asserting that was filed the day before the trial. And that is the basis for it.

> The [c]ourt allows [the] defense to continue to argue to the extent they [sic] desire to do so the 120 days in connection with the question of delay in addressing and resolving the matters, but wants to make clear that there's not going to be an argument on what the [c]ourt construes as an affirmative defense, which is that the claims exceed the 120 days prior to the 2001, Exhibit 81 date. And even though I know you disagree with the ruling, do you and counsel understand it?

(Emphases added.)

The court, however, was incorrect in construing the 120–day requirement in the tariff as a statute of limitations. In deciding that the 120–day limitation did not apply because the 120–day "affirmative defense" was untimely, the court effectively allowed a waiver of one of the tariff requirements, which is not permissible under the filed-rate doctrine. Unlike a statute of limitations, a tariff provision cannot be waived. See Qwest Corp. v. AT & T Corp., 371 F.Supp.2d 1250, 1251 (D.Colo.2005) ("the filed tariff doctrine prevents parties from contractually modifying tariffs. This prohibition includes not only modification of tariffs' rates and terms, but also modifications of a party's potential liability under tariffs, such as in the form of a release or waiver."); MCI v. Best Telephone Co., Inc., 898 F.Supp. 868, 875 (S.D.Fla.1994) ("The defendant's affirmative defenses of breach of the terms and conditions of the tariff and failure to comply substantially with the terms and conditions of the tariff are not barred as a matter of law because all of the tariff's terms govern the parties' rights and liabilities.") (emphasis added); Clancy v. Consolidated Freightways, 136 Cal.App.3d 543, 548, 186 Cal.Rptr. 257 (Cal.Ct.App.1982) ("[t]he provisions found in a carrier's tariffs, including those which limit the time in which to commence an action against the carrier, cannot be waived by the carrier since to permit waiver would be to enable the carrier to discriminate among shippers and this is prohibited by the Interstate Commerce Act.") (emphasis added).

The proposition that a filing time period within a tariff cannot be waived inheres in this court's reasoning in Waikoloa, which states that "the filed-rate doctrine applies to more than just rates; it extends to the services, classifications, charges, and practices included in the rate filing." 109 Hawai'i at 273, 125 P.3d at 494 (emphasis added). Therefore, all of the "services, classifications, charges, and practices" included in the PUC and FCC tariffs, including the 120–day time limitation, would apply to the claims at issue in this case.

Courts in other jurisdictions have directly addressed the issue of time limitation provisions in a tariff in the context of the filed-rate doctrine, and have concluded that time limitations, like other tariff terms, cannot be waived. In Qwest Corp., the District Court

of Colorado held that the parties could not, "as a matter of law, release or waive AT & T's obligations under Qwest's tariff, nor alter any applicable statute of limitations." 371 F.Supp. at 1252. In *Clancy*, a California Court of Appeal case, the court held that "to permit a waiver [of a limitation on the time in which to commence an action against the carrier] would be to enable the carrier to discriminate among shippers." 136 Cal. App.3d at 548, 186 Cal.Rptr. 257 (emphasis added). *Clancy* reasoned that the timing provision in the tariff was "essential to secure the general public interest in adequate nondiscriminatory transportation at reasonable rates and therefore rigid adherence to the statutory scheme and uniform standards required." *Id.* (citation omitted). Thus, the court here erred in allowing the tariff "statute of limitations" to be waived as an affirmative defense that was not timely raised.

### C.

PLNI argues that the time limitation is not at issue in this case, because even though tariffs are implicated, the filed-rate doctrine does not apply. Specifically, PLNI alleges that "the filed rate doctrine does not bar claims where 'the plaintiffs … paid the file rate but arguably did not receive a benefit or service in exchange for the payment[,]' " and that because the claims in the instant case meet this description, they should not be barred by the filed-rate doctrine. (Quoting *Balthazar*, 109 Hawai'i at 81, 123 P.3d at 206.) (Citation omitted.)

The quoted language from *Balthazar* is consistent with that opinion's reasoning that courts may enforce the tariffs without implicating the filed-rate doctrine, so long as the court's judgment will not result in price discrimination among rate payers, and the reasonableness of the rates is not at issue. *See Balthazar*, 109 Hawai'i at 73, 123 P.3d at 198. Thus, in cases where plaintiffs arguably paid the filed rate, and the issue is merely one of enforcement of the tariff provisions, the plaintiffs claims will not be barred by the filed-rate doctrine.

*Balthazar* explained that the tariffs at issue in that case required that customers pay for "Touch Calling" services, and that in

paying for those services, plaintiffs had in fact received a benefit or service in exchange for paying the filed rate, so they suffered no legally cognizable injury under the filed-rate doctrine. *Id.* at 70, 123 P.3d at 195. While *Balthazar* dealt with the enforcement of tariff rates, *Balthazar* did not need to address the enforcement of other tariff terms, such as time limitations. Thus, this case is distinguishable from *Balthazar* on those grounds. However, to the extent that *Balthazar* holds that parties must be held to the terms of the tariffs, the reasoning is applicable here.

In enforcing the tariffs in this case, this court must also enforce the 120–day time limitation that is contained in the tariffs, and thus was approved by the PUC. As in *Balthazar*, where the PUC had approved the tariff provision requiring payment for Touch Calling, the PUC has approved the tariff provision relevant to this case—that all disputes not submitted within 120–days of the billing are deemed waived. PUC Tariff § 2.7; FCC Tariff § 2.11. Thus, in addition to setting out the rates for services, the filed tariffs also contemplate a time limitation with respect to any billing disputes, and this court must give effect to that provision just as it would give effect to the rates themselves.

In *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994), the Second Circuit described the filed rate doctrine as follows:

> This regime protects consumers while fostering stability. The regulatory agencies are deeply familiar with the workings of the regulated industry and utilize this special expertise in evaluating the reasonableness of rates. The agencies' experience and investigative capacity make them well-equipped to discern from an entity's submissions what costs are reasonable and in turn what rates are reasonable in light of these costs.

27 F.3d at 20–21 (emphasis added). The PUC and FCC approved the provisions of the applicable tariffs. As such, this court should give effect to all portions of the tariff, under the assumption that, where the PUC and FCC provided a time limitation on the filing of billing disputes, they had a reason for doing so. For example, the PUC and

FCC may have been able to require that Time Warner provide a lower rate to customers because the 120–day time limitation would decrease the costs incurred by the public utility in addressing disputes.

In this case, the recovery sought by PLNI would not have the effect of imposing a different rate from the filed tariff. *See Balthazar*, 109 Hawai'i at 74, 123 P.3d at 199 (stating that "courts have held that the filed-rate doctrine bars claims that seek damages if an award of damages would have the effect of imposing any rate other than that reflected in the filed tariff") (citation and internal quotation marks omitted). However, to the extent that PLNI may have sought damages for claims that do not satisfy the 120–day time limitation in the tariffs, the jury's award has the effect of imposing terms that are different from those in the filed tariff. This is just as problematic from the standpoint of the filed-rate doctrine. As explained *supra*, the filed-rate doctrine also extends to practices included in the rate filing. *See Waikoloa*, 109 Hawai'i at 273, 125 P.3d at 494. If this court were not to enforce the 120–day limitation term against PLNI in this case, it would be applying the tariffs in an inconsistent fashion, effectively allowing PLNI to be subject to different, more lenient, tariff terms than other similarly situated entities.

■ Put another way, if Time Warner and PLNI had a contract stating that Time Warner was waiving the 120–day provision in the tariffs, such a contract would not be enforceable. The filed-rate doctrine requires that "neither the tort of the carrier nor the existence of a contract will work to vary or enlarge the rights defined in a tariff." *Balthazar*, 109 Hawai'i at 73, 123 P.3d at 198 (citing *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922)). Thus, the parties in this case could not contract around the 120–day provision if they tried to do so, because it is part of the tariff terms. If this court did not

recognize the 120–day time limitation on the claims brought by PLNI, it would essentially be allowing the parties to waive that provision of the tariffs, in contravention of the filed-rate doctrine, just as if it enforced a contract between the parties waiving that tariff term. Therefore, although PLNI contends that its suit is to enforce the filed rates, the filed rate doctrine would still serve to bar an award to PLNI in connection with any dispute that was filed with Time Warner more than 120 days after receipt of billing, because under the tariff, any billing dispute claim not submitted "within 120 days of receipt of billing ... shall be deemed waived."[24] (Emphasis added.)

## XI. Remedy for Application of the Filed–Rate Doctrine

■ Having determined that the 120–day time limitation does apply, the next question is the appropriate remedy. At trial, Time Warner requested the following instruction (Time Warner's Requested Jury Instruction No. 16):

### TARIFF—BILLING DISPUTE PROCEDURES

By law, any objections to billed charges must be reported to Time Warner Telecom within 120 days of the receipt of the billing, or such claims are waived. All claims objecting to billing must include supporting documentation.

If a claim is timely filed and supporting documentation is provided, Time Warner Telecom is required to make adjustments to the invoices, but only where circumstances exist which reasonably indicate that such adjustments are appropriate.

The court did not give the instruction, apparently because it had stricken that "affirmative defense." Ultimately, no instruction was given to the jury specifically on the 120–day provision. However, the court did instruct

---

24. Although this result may limit recovery in the instant case, such a result would not incentivize Time Warner to mis-bill its customers. Time Warner is still subject to all objections to billed charges that are reported within 120 days of the receipt of the bills. *See* PUC Tariff § 2.7; FCC Tariff § 2.11. Additionally, according to the FCC

tariff, "[i]f the dispute is resolved in favor of the Customer and the Customer has paid the disputed amount, the Customer will receive an interest credit from the Company for the disputed amount times a late factor [of 1.5% per month]." FCC Tariff § 2.11.2.

the jury as to the tariffs generally, with the following jury instruction:

> Telecommunications carriers are required to file tariffs with the [FCC] and [PUC]. These filed tariffs govern the telecommunications carriers' services, rates and charges. Telecommunications carriers and their customers are required to comply with these tariffs. The tariffs are both contracts and the law.

The jury was provided with a copy of the full PUC and FCC tariffs as Trial Exhibits D–2 and D–3.

Time Warner argues that the jury verdict "allowed the law of tariffs to be completely disregarded." PLNI, on the other hand, alleges that even if the tariff provision setting out the 120–day time limitation does apply, "there was no danger the jury was unaware of the 120–day provision in the tariff."

### A.

As noted, the Feature Group D claims involved two discrete disputes. The first was related to a September 18, 2001 Customer Investigation Form filed by PLNI, which apparently included billing disputes for call termination from May 2000 through September 2001. At trial, PLNI introduced evidence that it was owed a credit in the amount of $327,714.03 that had been due to its predecessor, GST. Time Warner disputed the validity of this evidence on two alternative grounds.

First, Time Warner argued that it had already credited PLNI's predecessor, GST, for the amount it was due, as part of the $327,714.03 credit. Second, and relatedly, it alleged that even if PLNI was due some credit, it was not owed the entire $327,714.03 amount, because the $327,714.03 was credited to GST for a separate transaction between GST and Time Warner that was, in part or in whole, not related to the assets that PLNI acquired from GST.[25] Thus, it appears that at trial, the amount which PLNI would have been owed on this billing credit, assuming that it could establish that Time Warner had

not credited GST already for amounts due, was in dispute. On this claim, the jury found in favor of PLNI and awarded $327,714.03 in damages. The jury clearly based its damage award on the evidence introduced by PLNI, which listed the credit at exactly $327,714.03.

At oral argument before this court, counsel for PLNI argued that Time Warner had conceded the credit in the amount of $327,714.03, and thus the 120–day limitation on disputed bills should not apply, because Time Warner admitted that it had owed that amount and the jury found that amount had not been paid to PLNI. Oral Argument at 3:55–4:30 and 1:05:00, *Pacific Lightnet, Inc. v. Time Warner Telecom, Inc. and Time Warner Telecom of Hawai'i, L.P.*, No. SCWC–28948, *available at* http://state.hi.us/jud/oa/13/SCOA_071713_28948.mp3. However, it does not appear that Time Warner actually conceded this point either at trial or on appeal.

At trial, although Time Warner's main argument seems to be that it had already credited PLNI's predecessor, GST, for the amount it was due, it also argued that even if PLNI was due some credit, it was not owed the whole $327K amount, because at least part of the credit was for entirely separate transactions between GST and Time Warner. For example, one of the witnesses for Time Warner explained that even though the evidence regarding the credit stated that it was for "Honolulu", it should not all be attributed to the GST Honolulu office, since the CIC account listed was "used both on the mainland and in Hawai'i," including for call termination from cities such as Bakersfield and San Luis Obispo in California. Time Warner also argued that PLNI was owed less than $327,714.03 based on its September 18, 2001 billing dispute form, which included only estimates of the disputed charges and contained charges based on bills that were received more than 120 days prior to the date Time Warner was notified of the dispute.

In its Opening Brief to the ICA, Time Warner stated that "[t]he improper action of the jury as described above is even more

---

**25.** Time Warner's argument on this issue appears to be both that the $327,714.03 credit was, in full or in part, for services of GST that PLNI

did not take over, and that the payment related to Time Warner's acquisition of part of GST.

telling because the $327,714.03 attributed to GST to wipe out its liabilities was not solely for call termination billings for GST Hawai'i assets—the only assets that PLNI acquired for GST[,] ... [t]he $327,714.03 was also for call termination billings on the mainland, which PLNI admitted it did not purchase."[26] Moreover, the court precluded Time Warner from arguing at trial that the disputed credits were barred by the 120–day limitation. Accordingly, Time Warner was not permitted to present its full range of arguments concerning these credits.

Because the amount owed to PLNI based on its September 18, 2001 Customer Investigation Form was still in contention during trial, a jury would need to consider which disputed bills were relevant to the 2001 Customer Investigation Form, and decide if those bills were received more than 120 days before the September 18, 2001 form was filed. Any disputed bills that a jury determines were received more than 120 days before September 18, 2001 cannot be taken into consideration as part of PLNI's recovery on its Customer Investigation Form claim. In this case, the jury awarded PLNI the full amount it requested. It is not clear that the jury considered the 120–day tariff provision as limiting the recovery of PLNI on its claims related to the September 18, 2001 Customer Investigation Form and alleged credit.

### B.

The second dispute was in connection with alleged overcharges by Time Warner, on bills issued to PLNI covering a period from October 11, 2001 through the date of trial in September 2011. On this claim, the jury found that Time Warner had breached its contract with PLNI, awarded $1 in damages for the breach, and found that PLNI had been overcharged in the amount of $118,109.58.

PLNI contends that the difference between the $118,109.58 that was actually awarded and PLNI's requested amount of $139,409.58 may represent the jury's consideration of the 120–day time limitation as a bar to recovery on certain claims. However, this cannot be verified based on the jury's verdict form or the evidence presented at trial, as nothing indicates how the jury took the 120–day time limit into consideration and PLNI does not explain how it knows that the jury's diminished award was based on a consideration of the 120–day limitation.

### C.

Therefore, since neither of the jury's awards demonstrate that the jury considered the 120–day time limitation, the appropriate remedy is to remand both issues for consideration by a new jury. On remand, the court must instruct the jury as to the 120–day provision in the tariffs, informing the jury that any claims brought by PLNI that were reported to Time Warner more than 120–days after PLNI or its predecessor GST received the disputed bill are waived.[27]

### XII. Other Arguments as to the Validity of the Jury Verdict

Time Warner further asserts that the jury verdict should be vacated because the jury decided that PLNI "need not pay the majority of its bills for call termination services including those services that were admittedly received and validly billed," and the jury required that Time Warner was responsible for billing, transmission, and call termination disputes which were beyond Time Warner's control, caused by PLNI or caused by third parties. The ICA did not reach these arguments, inasmuch as it determined that the jury verdict must be vacated because it violated the 120–day tariff provision. Since this case is remanded to the court for retrial on the Feature Group D claims, the merits of Time Warner's remaining challenges to the

26. Although Time Warner did not repeat this language in its Response to this court, it maintained that the ICA correctly vacated the jury verdict because it violated the filed-rate doctrine.

27. In the instant case, the jury was instructed that "tariffs are both contracts and the law[,]" and was given copies of the tariffs, among a myriad of other exhibits. This reflected the court's understanding that the 120–day provision operated like a statute of limitations and thus was waived as an affirmative defense, which, as discussed *supra*, was incorrect.

validity of the jury's verdict need not be addressed.

## XIII. Conclusion

Therefore, the ICA's February 21, 2013 judgment is vacated to the extent that it affirms the court's dismissal of the Feature Group D claims based on the primary jurisdiction doctrine. The ICA's judgment is upheld in all other respects, with respect to the Application, including its vacation of the jury verdict on the Feature Group D claims, which also vacated the court's stay of the jury verdict on those claims, but for the reasons stated herein. Accordingly, the court's December 12, 2007 judgment dismissing the Feature Group D claims and staying the jury verdict on the Feature Group D claims is vacated, and the case is remanded for a new trial on the Feature Group D claims, consistent with the foregoing opinion.